HARDY *v.* UNITED STATES.

No. 112.   Argued November 21, 1963.—
Decided January 6, 1964.

*Mozart G. Ratner* argued the cause and filed briefs for petitioner.

*Louis F. Claiborne* argued the cause for the United States.   On the brief were *Solicitor General Cox, Assistant Attorney General Miller* and *Philip R. Monahan.*

*John H. Pratt, Daniel M. Singer* and *Louis M. Kaplan* filed a brief for the Bar Association of the District of Columbia, as *amicus curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner, a pauper, has been convicted and sentenced to prison. After conviction the court-appointed lawyer, who represented him at the trial, withdrew his appearance with the approval of the court. The present court-appointed attorney is a different person, appointed by the Court of Appeals after the indigent had prepared *pro se* a petition for leave to appeal *in forma pauperis.* The District Court denied leave to appeal *in forma pauperis.* The Court of Appeals, although empowered to allow the appeal (*Coppedge* v. *United States,* 369 U. S. 438, 455), merely allowed petitioner to proceed *in forma pauperis* for purposes of the appeal "to the extent of having the stenographic transcript of the testimony and evidence presented by the government prepared at the expense of the United States," as those parts of the transcript were the only ones that relate "to the conclusory allegations" formulated by the indigent defendant *pro se.* See *Ingram* v. *United States,* 315 F. 2d 29, 30–31. After a petition for rehearing was denied, petitioner moved the Court of Appeals for a transcript of the balance of the proceedings in the District Court. This motion was denied by a divided Bench. The case is here on certiorari. 373 U. S. 902.

We deal with the federal system where the appeal is a matter of right (*Coppedge* v. *United States, supra,* at 441; 28 U. S. C. §§ 1291, 1294), and where the appellant is entitled to "the aid of counsel unless he insists on being his own." *Johnson* v. *United States,* 352 U. S. 565, 566. Congress has buttressed that right of appeal in several ways. It has provided in 28 U. S. C. § 1915 that any federal court may authorize an "appeal" *in forma pau-*

*peris,* except that such an appeal may not be taken if the trial court certifies that "it is not taken in good faith." Further, a transcript is available for appeal purposes, Congress having provided in the Court Reporter Act, 28 U. S. C. § 753 (b), that a transcript "by shorthand or by mechanical means" of "all proceedings in criminal cases had in open court" shall be made. The United States Attorney for the District of Columbia has adopted the practice of furnishing to indigents a full transcript on request if the cost to the United States is not more than $200.[1] That policy draws a distinction not present in the statute nor in the Rules of the Court of Appeals which provide that, when the court allows an appeal *in forma pauperis,* it shall then determine "whether and to what extent, a transcript will be necessary for the proper determination of the appeal." D. C. Cir. Rule 33 (b)(2)(i).

We have here a case where an appeal *in forma pauperis* has not yet been allowed. But whether counsel seeks an entire transcript at that stage or later on, the problem seems to us to be the same.

A court-appointed counsel who represents the indigent on appeal gets at public expense, as a minimum, the transcript which is relevant to the points of error assigned. *Coppedge* v. *United States, supra,* at 446; *Ingram* v. *United States, supra.*[2] But when, as here, new

---

[1] During oral argument of this case, counsel for respondent stated that the United States Attorney for the District of Columbia initiated, since this case was before the lower courts, a practice of not filing an opposition to a motion for a full transcript where the cost of such a transcript will not exceed $200. This is usually the case when the trial does not exceed three days. This practice is followed because the United States Attorney feels that the time and effort necessary to oppose such a motion will, in terms of dollars, exceed $200. According to counsel, the Federal District Court, pursuant to a "tacit" understanding, usually grants unopposed motions for a complete transcript.

·counsel represents the indigent on appeal, how can he faithfully discharge the obligation which the court has placed on him unless he can read the entire transcript? His duty may possibly not be discharged if he is allowed less than that. For Rule 52 (b) of the Federal Rules of Criminal Procedure provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The right to notice "plain errors or defects" is illusory if no transcript is available at least to one whose lawyer on appeal enters the case after the trial is ended.[3]

---

[2] In *Ingram* the Court of Appeals said:

". . . when a *pro se* petition is filed, upon direct appeal from judgment of conviction, and the claims of error stated therein (e. g., 'insufficiency of evidence,' 'unlawful search and seizure,') are so conclusory in nature that 'their substance cannot adequately be ascertained,' counsel will be appointed and, simultaneously, the portion of the transcript of proceedings which relates to the conclusory allegations will be ordered so that appointed counsel may determine their merit. Of course, counsel will not be limited to the transcript initially allowed if he can in good conscience advance other claims of error requiring additional portions of the transcript." *Id.*, at 30–31.

[3] Boskey, The Right to Counsel in Appellate Proceedings, 45 Minn. L. Rev. 783, 792–793 (1961), in speaking of the task of counsel who is appointed to represent the appellant and who did not serve as trial counsel, says:

". . . the new counsel is operating under serious handicaps. Normally he has no prior acquaintance with the trial proceedings and no personal knowledge· of the case which would form a basis for sound judgment. Normally no transcript is in existence at this stage, so he cannot make his·own independent analysis of the trial proceedings.

"In order to investigate whether the appeal involves one or more 'not plainly frivolous' issues, counsel may examine the formal documents on record in the trial court; he may interview his client; he may discuss the case with defendant's trial counsel and with the prosecutor; he may try to work out with the prosecutor an 'agreed statement' of the case, despite the fact that he lacks the information necessary to assure himself that the agreed statement would be an accurate one; he may ask the official court reporter as a courtesy to read back certain limited portions of the reporter's shorthand notes

The duty of counsel on appeal, as we noted in *Ellis* v. *United States,* 356 U. S. 674, 675, is not to serve as *amicus* to the Court of Appeals, but as advocate for the appellant:

> "Normally, allowance of an appeal should not be denied until an indigent has had adequate representation by counsel. *Johnson* v. *United States,* 352 U. S. 565. In this case, it appears that the two attorneys appointed by the Court of Appeals, performed essentially the role of *amici curiae.* But representation in the role of an advocate is required. If counsel is convinced, *after conscientious investigation,* that the appeal is frivolous, of course, he may ask to withdraw on that account. If the court is satisfied that counsel *has diligently investigated* the

---

(or all of them, if the trial was a short one); and it has been suggested—though perhaps without too much regard for the practicalities of some situations—that he may even interview the trial judge and seek to inspect any notes which the trial judge kept of the trial proceedings. Such efforts are apt to be incredibly time-consuming and frustrating, and sometimes may arouse in counsel a feeling that he would be well advised to avoid future assignments of appellate in forma pauperis work. But worse than that, in many instances these efforts will be wholly unsatisfactory as a means of safeguarding the defendant's rights.

"Recollections and notes of trial counsel and of others are apt to be faulty and incomplete. Frequently, issues simply cannot even be seen—let alone assessed—without reading an accurate transcript. Particularly is this true of questions relating to evidence or to the judge's charge; and it may also apply to many other types of questions. Moreover, the actual record (if appellate counsel could have it to inspect) might disclose issues substantial enough to constitute probable or possible 'plain error,' even though trial counsel was not aware of their existence; and the indigent should have the same opportunity as the wealthy to urge that plain error should be noticed on appeal. In short, a conscientious counsel freshly entering the case at the appellate stage normally is likely to conclude that a full or partial transcript of the trial proceedings will be indispensable if the requisite 'dependable record' is to be obtained as a basis for evaluating the case."

possible grounds of appeal, and agrees with counsel's evaluation of the case, then leave to withdraw may be allowed and leave to appeal may be denied." (Italics added.)

We deal here only with the statutory scheme and do not reach a consideration of constitutional requirements. We see no escape from the conclusion that either where the requirements of a nonfrivolous appeal prescribed by *Coppedge* v. *United States, supra,* are met, or where such a showing is sought to be made, and where counsel on appeal was not counsel at the trial, the requirements placed on him by *Ellis* v. *United States, supra,* will often make it seem necessary to him to obtain an entire transcript.

We conclude that this counsel's duty cannot be discharged unless he has a transcript of the testimony and evidence presented by the defendant and also the court's charge to the jury, as well as the testimony and evidence presented by the prosecution.

*Reversed.*

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN and MR. JUSTICE STEWART join, concurring.

I join the Court's opinion which is written narrowly within the framework of prior decisions. I concur separately, however, to state my conviction that in the interests of justice this Court should require, under our supervisory power, that full transcripts be provided, without limitation, in all federal criminal cases to defendants who cannot afford to purchase them, whenever they seek to prosecute an appeal.

The problem here arises out of the different procedures by which criminal appeals taken by indigent and non-indigent defendants are processed in the District of

Columbia and other federal courts. The procedure for nonindigents, who are represented by retained counsel and who are generally free on bail pending appeal, is automatic, direct and prompt. Within 10 days after judgment, counsel files a simple notice of appeal with the clerk of the District Court; a transcript is purchased and filed with the Court of Appeals; and the case is then automatically placed on the calendar for briefing and argument on the merits.[1] The procedure for indigents, who are generally incarcerated pending appeal because of their inability to make bail,[2] is indirect, dilatory and discretionary. A key difference is that while a nonindigent may appeal, in effect, as a matter of right, an indigent must make a showing that his claims of error are not frivolous before he is given permission to appeal. A brief description of the process by which the federal courts seek to screen frivolous attempts to appeal *in forma pauperis* is necessary to an understanding of the problem raised by this case.

Following the conviction and sentencing of an indigent defendant, his court-appointed trial lawyer often withdraws from the case.[3] If the right to appeal is to be pre-

---

[1] Rule 39 (d) of the Federal Rules of Criminal Procedure provides that:

"Unless good cause is shown for an earlier hearing, the appellate court shall set the appeal for argument on a date not less than 30 days after the filing in that court of the record on appeal and as soon after the expiration of that period as the state of the calendar will permit. Preference shall be given to appeals in criminal cases over appeals in civil cases."

[2] See *Pannell* v. *United States*, 115 U. S. App. D. C. 379, 320 F. 2d 698; Committee on the Administration of Bail of the Junior Bar Section of the Bar Association of the District of Columbia, Report on the Bail System of the District of Columbia (1963).

[3] Permitting the trial lawyer to withdraw at that stage probably reflects a recognition both of the burden of serving as uncompensated trial counsel and of the different skills often possessed by trial and

served, the defendant *pro se* must file a notice of appeal within 10 days after the entry of the judgment and must apply to the District Court for leave to appeal *in forma pauperis*. The application must include a statement of the alleged errors the defendant seeks to raise on appeal. Unless the District Court concludes that the appeal is not taken in "good faith," leave to appeal *in forma pauperis* must be granted. If the District Court denies leave to appeal *in forma pauperis,* the defendant, who, as previously noted, is often without the services of an attorney, may apply to the Court of Appeals for leave to appeal. If the Court of Appeals can determine from the application that a nonfrivolous claim of error exists, it

---

appellate lawyers. By noting the existence of a hiatus in representation at such a critical period, I do not intend to signify approval.

The Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice described this phase of the process as follows: "[T]he convicted defendant must file a notice of appeal within ten days after the entry of the judgment, if the right to appeal is to be preserved. Since an assigned counsel under present practices often does not conceive it to be part of his obligations to advise the defendant of his right to appeal or to assist in perfecting that right, and since many district courts do not routinely advise the defendant of his appeal rights, some financially disadvantaged defendants, because of their ignorance of the jurisdictional requirements, irrevocably lose their rights to appeal. The defendant who is unable to pay the costs of a trial transcript or to pay court costs is required to apply for leave to appeal *in forma pauperis*. The application, which is in affidavit form, contains allegations of financial incapacity and the reasons relied on by defendant to obtain redress in the appellate courts. Because normally no provision is made for counsel at this stage of the proceedings, the application is often inexpertly prepared and conceived, frequently resulting in injury to the defendant's interests and to the sound administration of justice." Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice, Report on Poverty and the Administration of Federal Criminal Justice (1963), 100 (hereinafter cited as Attorney General's Report).

must grant leave to appeal. If leave is granted, either by the District Court or the Court of Appeals, a lawyer is then appointed and supplied with the portions of the transcript relating to the nonfrivolous claims. If he then desires any additional portion of the transcript to help him prepare his appeal on the merits, he must ask the Court of Appeals to order its preparation.

If the District Court has denied leave to appeal *in forma pauperis,* and if "the claims made or the issues sought to be raised by the applicant are such that their substance cannot adequately be ascertained from the face of the defendant's application, the Court of Appeals must provide the would-be appellant with both the assistance of counsel and a record of sufficient completeness to enable him to attempt to make a showing . . ." that the case presents a nonfrivolous issue. *Coppedge* v. *United States,* 369 U. S. 438, 446. A "record of sufficient completeness" has been interpreted by the Court of Appeals for the District of Columbia to mean "the portion of the transcript of proceedings which relates to the conclusory allegations" made by the defendant in his *pro se* application. *Ingram* v. *United States,* 114 U. S. App. D. C. 283, 285, 315 F. 2d 29, 31. After receiving the relevant portion of the transcript, the appointed lawyer has the duty of preparing a memorandum showing, if he can, that the case presents a nonfrivolous issue and that leave to appeal should be granted. If the lawyer finds what he considers a nonfrivolous claim of error in the portion of the transcript he has been given, he files the memorandum. If the court then agrees that there is a nonfrivolous issue, it must grant leave to appeal *in forma pauperis,* and the same previously described procedure is then followed as would be followed if leave had been granted originally by the District Court or the Court of Appeals.

If the lawyer has examined the portions of the transcript relating to the *pro se* claims of error and has satisfied himself that they contain no issue which he can assert to be nonfrivolous, he then has these alternatives. Deeming his appointed function exhausted, the attorney may seek leave from the Court of Appeals to withdraw from the case on the ground that he is satisfied that the case presents no issue which is nonfrivolous.[4] If leave to withdraw is granted, a new lawyer is generally not appointed, and the defendant is informed that he may submit his own memorandum in support of his application. Since the *pro se* memorandum will rarely add anything to the original application, once the lawyer is given leave to withdraw denial of the defendant's application is virtually inevitable.

The lawyer who has satisfied himself that the transcript originally ordered contains no nonfrivolous issue may, however, decide to request additional portions of the transcript before seeking to withdraw from the case. If his examination of the original portions of the transcript leads him to suspect specific error in other portions of the transcript, the Court of Appeals, upon being presented with these new claims of error, will order the production of those portions of the transcript relating to these claims.

Where the appointed lawyer can find no nonfrivolous claim of error in the portion of the transcript relating to the claims raised in the defendant's *pro se* application but has no idea whether the remainder of the transcript will disclose any such claim, he cannot in good conscience allege any new claim of error to which additional portions of the transcript would be relevant. Nor can he, without being furnished with the remainder of the transcript, conclude in good conscience that the case presents no issue which is nonfrivolous.

---

[4] In the District of Columbia, many lawyers chose this course and, at least until recently, leave to withdraw was freely granted.

Counsel in this case was presented with precisely this dilemma and sought resolution of it by asking the Court of Appeals either to order the production of the remainder of the transcript, or to terminate his responsibility in that court by denying leave to appeal *in forma pauperis*. The Court of Appeals granted neither request. Thus we now have before us for resolution the problem of the conscientious appointed counsel at this critical stage in the screening process.

This case, therefore, although it arises in the context of a request for portions of a transcript, raises fundamental questions concerning the proper role of appointed counsel on appeal. If the function of appointed counsel is essentially to aid the court, as *amicus curiae,* in assessing the claims of errors made in the *pro se* petition and in determining whether they include a nonfrivolous issue, then the practice now prevailing is perfectly suited to its end. It is then entirely logical to give the appointed lawyer only those portions of the transcript relating to the *pro se* claims of error, and to permit him to withdraw from the case if those portions of the transcript reveal no nonfrivolous claims. However, if the proper function of the appointed lawyer is essentially the same as that of the retained lawyer—to be an effective advocate in an adversary system—then there can be no justification for limiting him to those portions of the transcript relating to the claims of error raised by his indigent and often illiterate client and for permitting—indeed in effect requiring—him to withdraw from the case without examining the remainder of the trial transcript. It cannot seriously be suggested that a retained and experienced appellate lawyer would limit himself to the portions of the transcript designated by his client or even by the trial attorney, especially where the Courts of Appeals may, and not infrequently do, reverse convictions for "plain errors" not raised at trial.

The proper function of appointed counsel on appeal has been described by this Court. "[R]epresentation in the role of an advocate is required." *Ellis* v. *United States,* 356 U. S. 674, 675. It is not enough that the appointed counsel perform "essentially the role of *amici curiae.*" *Ibid.* If this requirement is to be more than a hollow platitude, then appointed counsel must be provided with the tools of an advocate. As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law.[5] Anything short of a complete transcript is incompatible with effective appellate advocacy.

The opinion of the Court agrees with this conclusion as it relates to "one whose lawyer on appeal enters the case after the trial is ended." *Ante,* at 280. I believe that it is equally applicable to one whose appointed lawyer on appeal was also his lawyer at trial. No responsible retained lawyer who represents a defendant at trial will rely exclusively on his memory (even as supplemented by trial notes) in composing a list of possible trial errors which delimit his appeal. Nor should this be required of an appointed lawyer. An appointed lawyer, whether or not he represented the defendant at trial, needs a complete trial transcript to discharge his full responsibility of preparing the memorandum supporting the application to proceed *in forma pauperis.*[6]

---

[5] See, *e. g., Tatum* v. *United States,* 88 U. S. App. D. C. 386, 190 F. 2d 612; *Durham* v. *United States,* 94 U. S. App. D. C. 228, 214 F. 2d 862; *United States* v. *Currens,* 290 F. 2d 751; *McDonald* v. *United States,* 114 U. S. App. D. C. 120, 312 F. 2d 847; *Miller* v. *United States,* 116 U. S. App. D. C. 45, 320 F. 2d 767.

[6] Under the practice now prevailing, problems relating to transcripts may arise both before and after leave to appeal *in forma*

I believe further that the availability of a complete transcript should not be made to depend on the facts of each case. This Court has recently condemned "the inevitable delay that surrounds a procedure in which the courts give piecemeal attention to the series of motions that indigents must make before a final adjudication of the merits of their cases is reached." *Coppedge* v. *United States,* 369 U. S., at 450. One of the prime reasons for this delay has been the "separate considerations of motions . . . for the preparation of a transcript of the trial proceedings . . . ." *Ibid.* A case-by-case approach— regardless of the governing standard—must inevitably contribute to this delay. Experience in this area has shown the need for a clear and simple across-the-board rule that would obviate the necessity for further court considerations of transcript requests. This rule should be that any criminal defendant desiring to appeal who cannot afford a transcript [7] must be given one to help his appointed lawyer prepare a memorandum establishing the existence of a nonfrivolous issue in support of the application for leave to appeal *in forma pauperis.*

*pauperis* is granted. If counsel were provided with a complete transcript upon being appointed to prepare the memorandum in support of the application to appeal *in forma pauperis,* the problem of supplying additional portions of the transcript after leave is granted would become moot.

[7] Indigence "must be conceived as a relative concept. An impoverished accused is not necessarily one totally devoid of means." Attorney General's Report, at 8. An accused must be deemed indigent when "at any stage of the proceedings [his] lack of means . . . substantially inhibits or prevents the proper assertion of a [particular] right or a claim of right." *Ibid.* Indigence must be defined with reference to the particular right asserted. Thus, the fact that a defendant may be able to muster enough resources, of his own or of a friend or relative, to obtain bail does not in itself establish his nonindigence for the purpose of purchasing a complete trial transcript or retaining a lawyer.

The Government suggests that such a memorandum can be adequately prepared, even by a lawyer newly appointed on appeal, without more transcript than is presently provided. It would have the lawyer conduct an investigation, including interviews with the trial judge, the prosecuting attorney and the trial defense counsel, in an effort to reconstruct the events of the trial. At best, however, this is a poor substitute for a transcript in disclosing possible error. Moreover, a lawyer appointed to represent the interests of a defendant should not be required to delegate his responsibility of determining whether error occurred at trial to participants at that trial whose conduct may have formed the very basis for the errors. Finally, this interview requirement is unduly burdensome on the appointed lawyers who are required to serve without compensation. As the Attorney General's Committee on Poverty and the Administration of Criminal Justice recently observed: "It is not far from the truth to say that the federal system seeks to avoid the expenses of supplying transcripts to all financially disadvantaged defendants desiring to appeal by shifting the burdens to lawyers required to serve without compensation or reimbursement of expenses."[8]

I conclude, therefore, that the interests of equal justice and the viability of our adversary system[9] are impaired

---

[8] Attorney General's Report, at 102.

[9] *Id.*, at 10–11: "The essence of the adversary system is challenge. The survival of our system of criminal justice and the values which it advances depends upon a constant, searching, and creative questioning of official decisions and assertions of authority at all stages of the process. The proper performance of the defense function is thus as vital to the health of the system as the performance of the prosecuting and adjudicatory functions. It follows that insofar as the financial status of the accused impedes vigorous and proper challenges, it constitutes a threat to the viability of the adversary system. We believe that the system is imperiled by the large numbers of accused persons unable to employ counsel or to meet even modest bail requirements

when an indigent defendant's access to a trial transcript is not as complete as that of a paying defendant. This "concept of 'equal justice' does not confuse equality of treatment with identity of treatment." [10]   It does, however, require the Government to do "all that can reasonably be required of it to eliminate those factors that inhibit the proper and effective assertion" of the defendant's claims.[11]

Providing a complete transcript to all defendants who cannot afford to purchase one will not create an undue financial burden on the Government. Statistics for the last three years for which figures are available indicate that almost 90% of the criminal trials in the District of Columbia lasted three days or less and that a "transcript of a three-day trial will generally cost less than $200 to prepare . . . ." [12]   The Government informs us that its present practice in the District of Columbia is not to

and by the large, but indeterminate, numbers of persons, able to pay some part of the costs of defense, but unable to finance a full and proper defense. Persons suffering such disabilities are incapable of providing the challenges that are indispensable to satisfactory operation of the system. The loss to the interests of accused individuals, occasioned by these failures, [is] great and apparent. It is also clear that a situation in which persons are required to contest a serious accusation but are denied access to the tools of contest is offensive to fairness and equity. Beyond these considerations, however, is the fact that the conditions produced by the financial incapacity of the accused are detrimental to the proper functioning of the system of justice and that the loss in vitality of the adversary system, thereby occasioned, significantly endangers the basic interests of a free community."

[10] *Id.*, at 9.

[11] *Ibid.*

[12] Special Committee of the Junior Bar Section of the Bar Association of the District of Columbia, Report to the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice, reprinted in Brief of the Bar Association of the District of Columbia as *amicus curiae,* at A–9, A–16.

oppose the preparation of transcripts which cost $200 or less to prepare. It seems likely, therefore, that a system of free transcripts will, in the long run, be less expensive than the present system with its multiple proceedings and frequent delays.[13] Moreover, the financial costs are relatively unimportant when compared

---

[13] The Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice made the following observation concerning the real cost of the present system: "The Committee believes that proper evaluation of comparative costs requires that attention be directed to the 'hidden costs' of the present system. First there are the costs in judicial time in the district courts and courts of appeals, just noted, that result from the administration of the present system. Second are the costs in the time of public officials required to be interviewed by assigned counsel in his effort to establish a record or to justify the ordering of a transcript in proceedings involving leave to appeal *in forma pauperis*. Third are the costs of time, effort, and expense of assigned counsel. The present system is able to function at all only by shifting a large part of the burdens of the system on lawyers who are required to serve without compensation or reimbursement. It should be carefully noted that in a system of adequate representation involving the use of compensated counsel the shifting of many of these burdens to counsel will no longer be possible. In many cases the provision of a transcript at the outset of the appellate process will involve substantially less expense to the government than the payment of attorneys' fees for time spent by counsel in an effort to settle a record for disposition of the application to appeal *in forma pauperis* and in other proceedings made necessary by the present system. Fourth, a system that obstructs access to direct review is likely to encourage resort by prisoners to collateral attack on their convictions and sentences with losses of time and money thereby occasioned. Such has been the uniform experience of state systems of criminal justice." Attorney General's Report, at 114.

The Bar Association of the District of Columbia, in their brief *amicus curiae*, state that "On the basis of [their] experience as appointed counsel, [they] believe strongly that providing a trial transcript in every case will significantly reduce the number of collateral attack proceedings under 28 U. S. C. 2255, habeas corpus, or coram nobis." The Attorney General's Report also points out "the fact

with the unnecessary hardship to defendants, many of whom are incarcerated during their attempts to secure appellate review because of their inability to raise the necessary bail.[14]  I agree with Judge Learned Hand: "If

that the free accessibility and quality of appellate review has reduced collateral attacks on sentences imposed by courts martial [where the 'record is supplied the defendant at government expense'] to an absolute minimum." Attorney General's Report, at 109. Thus, the automatic provision of free transcripts to all federal criminal defendants who cannot afford to purchase them would seem to be entirely consistent with the spirit of our recent decision in *Bartone* v. *United States*, 375 U. S. 52, where the Court observed that "It is more appropriate, whenever possible, to correct errors reachable by the appeal rather than remit the parties to a new collateral proceeding." *Id.*, at 54.

[14] The recent case of William H. Kemp, arising in the District of Columbia, illustrates the complexity of the *in forma pauperis* procedures, the attendant delays, and the resulting injuries to the accused. The procedural history of the case, as compiled by the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice, follows:

1960, Dec. 13..... Joint indictment with one Gray for the crime of housebreaking, petty larceny, and unauthorized use of vehicle.  Crim. No. 1033–60.

Dec. 16..... Kemp pleaded not guilty.

1961, Feb. 3...... Gray convicted of all three counts; Kemp acquitted of housebreaking and larceny, convicted of unauthorized use of motor vehicle.

Mar. 17..... Judgment entered sentencing Kemp to imprisonment for a period of one to three years.

Mar. 21..... Kemp's application to proceed on appeal without prepayment of costs was denied as plainly frivolous and not taken in good faith.

Apr. 17..... Application to proceed on appeal without prepayment of costs filed in the court of appeals.

May 18..... Application for leave to appeal denied by a panel of the court of appeals, one judge dissenting.

June 1...... Petition for rehearing *en banc* filed.

we are to keep our democracy, there must be one commandment: Thou shalt not ration justice." [15]

Finally, the foregoing discussion leads me to the ultimate conclusion that the cause of equal justice is unduly hindered by the cumbersome obstacles to appeal which have been erected by the procedure for screening frivolous attempts to appeal *in forma pauperis*. I agree, therefore, with my Brothers STEWART and BRENNAN, in their concurring opinion in *Coppedge,* 369 U. S., at 458, that "each Court of Appeals might well consider whether its task could not be more expeditiously and responsibly performed by simply" eliminating the entire process for screening *in forma pauperis* appeals and by treating such appeals in the same manner as paid appeals are now

June 15..... Petition for rehearing *en banc* denied, two judges noting that they would grant the petition.

July 14..... Petition for leave to proceed *in forma pauperis* and petition for writ of certiorari filed in the Supreme Court of the United States. No. 311, Misc.

1962, May 14..... Motion for leave to proceed *in forma pauperis* and petition for certiorari granted; judgment vacated and case remanded for consideration in light of *Coppedge.*

July 18..... *Per curiam* order in Court of Appeals directing that petitioner be allowed to appeal without prepayment of costs and with transcript at government expense.

Dec. 13..... *Per curiam* reversal and remand with directions to enter a judgment n. o. v. and discharge of appellant.

Kemp was arrested on November 24, 1960. At the time of the opinion ordering his release, he had been confined well over two years. Attorney General's Report, at 103–104.

[15] Address before Legal Aid Society of New York, Feb. 16, 1951.

Even if I were to assume, as the Government argues, that requiring the provision of free services for indigents may sometimes have the effect of placing them in a more advantageous position than that of

treated.[16]   Since "no *a priori* justification can be found
for considering [*in forma pauperis* appeals], as a class, to
be more frivolous than those in which costs have been
paid," *id.*, at 449, it would seem to follow that no justi-
fication exists for erecting artificial barriers to appeal for
indigent defendants, "[p]articularly since [these] liti-
gants . . . may, in the trial court, have suffered disad-
vantages in the defense of their cases inherent in their
impecunious condition . . . ."   *Id.*, at 450.[17]   However,

_____

the defendant who, while not indigent, has limited financial resources,
the answer to this problem would not be to deny the means of an
effective appeal to the former; it would be to make such means more
easily available to the latter, by broadening the concept of "indi-
gency," see note 7, *supra,* by adopting a system whereby the accused
pays what he can afford and the Government pays the rest, or by
providing some or all of these resources freely to anyone who requests
them regardless of financial ability.   See note 13, *supra.*

[16] "The Government would then be free in any case to file before
argument a motion to dismiss the appeal as frivolous, as every appel-
lee is always free to do."   *Coppedge* v. *United States*, 369 U. S., at
458.

[17] Attorney General's Report, at 113–114: "[T]he Committee be-
lieves that the present practices are largely self-defeating and that
they can be abandoned without creating unmanageable burdens of
costs or necessitating undue expenditures of judicial time.   Every
justification of the present practices which has come to the Com-
mittee's attention is predicated on the assumption that the screen-
ing procedures are required to prevent an inundation of frivolous
appeals and that the increases in the number of appeals will result
in large monetary costs to the government and in substantial burdens
on adjudication in the courts of appeals.   We believe that even
if these fears were substantial, such considerations are not entitled
to be given decisive weight by a system of criminal justice dedi-
cated to the objective of full and equal justice to all accused per-
sons and to the proper and vigorous operation of the adversary
system.   The Committee notes, however, that many American states—
some sufficiently populous to provide reasonable comparisons with
the federal system of justice—have granted financially disadvantaged
defendants full access to appellate review without experiencing bur-

as long as the Courts of Appeals continue to require a preliminary showing before granting an indigent leave to appeal, we can do no less than require, under our supervisory power, that a full transcript be made available, without limitation, to the lawyer appointed to help make that showing.

Mr. Justice Clark, concurring in the result.

A half dozen years ago, 28 U. S. C. § 1915 clearly directed that no indigent appeal may be taken "if the trial court certifies in writing that it is not taken in good faith." The words of the statute are identical today but the Court's interpretations have stripped them of the apparent congressional meaning. In *Johnson* v. *United States*, 352 U. S. 565 (1957), we said that counsel must be appointed to represent an indigent who wishes to contest the validity of a certificate under § 1915 and that such counsel must be "enabled to show that the grounds for seeking an appeal from the judgment of conviction are not frivolous and do not justify the finding that the appeal is not sought in good faith." At 566. In *Farley* v. *United States*, 354 U. S. 521 (1957), counsel for the indigent claimed that the evidence was insufficient to justify the conviction, and this Court required a transcript to be furnished on that point. A year later in *Ellis* v. *United States*, 356 U. S. 674 (1958), it appeared that counsel appointed by the Court of Appeals "performed essentially the role of *amici curiae*," at 675, and the Court held that "representation in the role of an advocate is required," *ibid.*, vacating the judgment on the

---

dens approaching the magnitude of those sometimes predicted as the consequence of similar measures in the federal courts. We believe, also, that forecasts of inordinate burdens do not take adequate account of the fact that the proliferation of motions and petitions produced by present practice is highly expensive of judicial time."

concession of the Solicitor General that the question of probable cause raised by petitioner could not necessarily be called frivolous. In 1962 in *Coppedge* v. *United States,* 369 U. S. 438, the Court held:

> "It is not the burden of the petitioner to show that his appeal has merit, in the sense that he is bound, or even likely, to prevail ultimately. He is to be heard, as is any appellant in a criminal case, if he makes a rational argument on the law or facts. It is the burden of the Government, in opposing an attempted criminal appeal *in forma pauperis,* to show that the appeal is lacking in merit, indeed, that it is so lacking in merit that the court would dismiss the case on motion of the Government, had the case been docketed and a record been filed by an appellant able to afford the expense of complying with those requirements." At 448.

Today we are faced with the question whether counsel, appointed on an appeal to represent an indigent, but not present at the trial of the case in the District Court, is entitled to a full transcript so as to enable him to determine whether plain error or defects affecting substantial rights occurred during the trial. As I see the problem, the Government has not met the burden placed upon it by the above language in *Coppedge,* namely to sustain the frivolity of the appeal, insofar as plain error is concerned. It appears to me that the Government must furnish the full transcript in order to enable petitioner's new counsel to determine whether plain error occurred during the trial, and likewise to enable the Court of Appeals to pass upon the point.

While I dissented in *Coppedge* as well as *Farley,* I feel bound by their holdings and therefore concur in the result here. In so doing, I trust that when Congress adopts the

Criminal Justice Act or similar legislation* which provides compensation for counsel representing indigents, the same counsel who tried the case in the District Court will be appointed in the Court of Appeals.

Mr. Justice Harlan, dissenting.

I think the Court should not, in the name of exercising its supervisory powers, engraft this further requirement on 28 U. S. C. § 1915.[1]   The holding is that an indigent convict who—following the trial court's certification that his appeal was frivolous and not taken in good faith—has received at the direction of the Court of Appeals a free copy of that portion of the trial transcript germane to the errors asserted as grounds for appeal, is entitled as of right to a free copy of the balance of the transcript if his appellate counsel was not the lawyer who represented him at the trial.   The theory is that this is necessary to enable the new lawyer to discover possible "plain error."

Four members of the Court would go further.   They would furnish complete transcripts as a matter of course to all indigent appellants, whether or not represented at the appellate stage by the same lawyer who acted for them

---

*S. 1057, the proposed Criminal Justice Act, was passed by the Senate August 6, 1963.   The Judiciary Committee of the House of Representatives and the Rules Committee reported favorably a compromise bill, H. R. 7457, and on December 10, 1963, the House voted to take up the legislation on the floor.

[1] "§ 1915. *Proceedings in forma pauperis.*

"(a) Any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees and costs or security therefor, by a citizen who makes affidavit that he is unable to pay such costs or give security therefor.   Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that he is entitled to redress.

"An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."

at the trial. *Ante,* p. 288. And recognizing that any indigent receiving such a transcript is thus advantaged over an appellant who has to pay for his transcript, they go on to suggest that fairness may require that appellants who are not indigent, but impoverished, should be furnished free transcripts to the extent that they cannot afford to pay for them. *Ante,* p. 289, n. 7. Although the majority opinion stops short of both of these propositions, given what is now done can it be said that these more expansive positions are without force? Be that as it may, the Court has taken a long step in derogation of the hitherto consistently maintained view, both in federal and state criminal cases, that an indigent defendant is not automatically entitled to a free transcript simply because those economically better situated can obtain their transcripts at will. See *Johnson* v. *United States,* 352 U. S. 565, 566; *Griffin* v. *Illinois,* 351 U. S. 12, 20; *Eskridge* v. *Washington Prison Board,* 357 U. S. 214, 216; *Draper* v. *Washington,* 372 U. S. 487, 495.

Granting that § 1915 has not caught up with this Court's recent pronouncements in this area (see concurring opinion of CLARK, J., *ante,* pp. 296–298) and that, as recommended in the recent report of the Attorney General's Committee,[2] the time has come for a comprehensive overhauling of the procedures governing *in forma pauperis* appeals in the federal system, I believe that such an undertaking is more appropriately to be accomplished by congressional action, taken in collaboration with the Judicial Conference of the United States, than by piecemeal adjudications of this Court. Especially meet for such a course is the innovation made today, a step which in countrywide application affects the public treasury to an

---

[2] Poverty and the Administration of Federal Criminal Justice, Report of the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice (1963).

unknown degree, and whose wisdom should not be judged in the abstract or upon the limited data presently before the Court.

A balanced solution of a problem having such unforeseeable ramifications requires consideration of the informed views of those on the firing line of the administration of criminal justice—District judges, Circuit judges, United States attorneys, defense lawyers and Legal Aid Societies—and exploration of differing conditions among the Circuits. It might be concluded that a nationwide requirement of this sort would be unsound, and that the matter is best left for discrete treatment by the Judicial Councils in the various Circuits, subject of course to constitutional limitations. Remotely situated as this Court is from the day-to-day workings of the criminal system, it should hesitate to promulgate blanket requirements on this subject based largely upon theoretical considerations. Cf. *Sanders* v. *United States,* 373 U. S. 1, 23 (dissenting opinion of this writer).

I would dispose of this case as the Government suggests by remanding it to the Court of Appeals for further consideration in light of that court's subsequent decision in *Ingram* v. *United States,* 315 F. 2d 29. I do not understand this Court's decision to rest on constitutional grounds, nor do I think it well could.