597 So.2d 593 (1992)
STATE of Louisiana
v.
Elijah LYONS.
No. 89-KA-2307.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 1992.
*594 Patricia Regan Fox, Supervising Atty., Barbara-Ann Valvo, Student Practitioner, Brigette Piattoly, Student Practitioner, New Orleans, for appellant.
Harry F. Connick, Dist. Atty., Lisa A. McLachlan, Asst. Dist. Atty., New Orleans, for appellee.
Before KLEES, and LOBRANO, JJ., and GULOTTA, J. Pro Tem.
LOBRANO, Judge.
Defendant, Elijah Lyons, was charged by bill of information with manslaughter, a violation of Louisiana Revised Statute 14:31. Defendant requested and was granted appointment of a sanity commission. Following a lunacy hearing on April 4, 1988, defendant was found sane and able to stand trial. A second lunacy hearing was held on July 12, 1988 at which time the trial court ordered that defendant be tested at Feliciana Forensic Facility. On October 4, 1988, the trial court again found defendant sane and able to stand trial. On January 10 and 11, 1989, defendant was tried by a twelve member jury and was found guilty as charged. On March 29, 1989, following a multiple bill hearing, defendant was sentenced to serve thirty-five (35) years at hard labor.
FACTS:
On January 26, 1988, defendant telephoned the police, informed them that his brother Danny had been stabbed and requested an ambulance. When the ambulance arrived, defendant informed emergency medical technicians (EMTS), Wayne Bascle and Vivian Schlosser, that he had stabbed his brother. The victim, Danny Lyons, was found lying on the bed in a back bedroom. He was cold and had no vital signs. Defendant gave the EMTS the lock-blade knife he used to stab his brother. He was calm, cooperative, oriented to time and place and answered questions appropriately. The room was not in disarray and no other weapons were found.
When the police arrived, EMT Wayne Bascle explained the situation and gave them the knife. Officer Troy Savage advised defendant of his rights and that he was under arrest. He testified that defendant appeared to understand and voluntarily gave a statement that he stabbed Danny because he wouldn't leave him alone. Savage further stated that defendant spoke freely, coherently, nonchalantly, did not stumble or smell of alcohol and no alcohol or other weapons were found.
Homicide Detective, John C. Miller, arrived with the crime lab technicians shortly after Officer Savage. Miller found defendant seated on the living room sofa. Miller and the crime lab technicians investigated the scene, took the necessary photographs and preserved the evidence.
Miller asked defendant if he had been informed of his rights and if he understood those rights. Defendant answered both questions in the affirmative. Miller then asked defendant if he wanted to give a statement. Defendant replied he "might as well because [he] already told everyone else." Miller testified that although defendant appeared glassy-eyed and smelled somewhat of beer, he was calm and coherent.
Miller testified that defendant related to him the following:

*595 Defendant stated he was lying on the sofa when he heard someone banging on the door. He had instructions from his mother not to open for any reason after certain hours because of the crime in the neighborhood. He admitted that he knew that it was his brother but refused to open the door because he feared his brother was drunk and would hurt him. Shortly thereafter he heard someone trying to enter through a rear bedroom window. When he went to investigate, he saw Danny climbing through the window. He then returned to the sofa where he had been sleeping. Danny approached him and began "messing with him". In the course of defending himself, he stabbed Danny. Defendant stated that as far as he knew, Danny was not armed.
Defendant was then transported to Miller's office where he was again advised of his rights and gave another statement in the presence of Miller and his supervisor, Sergeant Donald Curale. Both the statement and defendant's waiver of rights were tape recorded and transcribed. The substance of defendant's taped statement is as follows:
Danny became angry because defendant refused to open the door. Defendant's mother had instructed defendant not to open the door after 10:00 p.m. because someone could be running from the police and he could get his `brains knocked out'. Danny then climbed through a rear window, lunged at defendant and threatened him. Defendant, believing Danny had a weapon, stabbed Danny. Defendant stated he was afraid of Danny because of several previous attacks. The last of these attacks occurred two months earlier when Danny attacked defendant with a baseball bat and a gun. In the ensuing scuffle, Danny gave defendant a black eye and shot him once in the knee. Defendant shot Danny five times. Defendant then stated he walked into the back room to see who was entering through the window, then turned to walk out once he saw it was Danny. As he turned, Danny attacked him from behind, screaming and hollering. Defendant assumed Danny had a weapon and pulled a knife. When Danny saw the knife, he said to defendant, `You're a coward, you're not gonna do me nothing' and then Danny lunged at him. Defendant then stabbed Danny once in the chest. Defendant stated he had consumed approximately six beers that night; that no one witnessed the incident and that his mother was asleep. He called the police, informed them he had stabbed his brother and asked for an ambulance. Defendant stated he gave this statement of his own free will with no coercion, intimidation or threats.
In addition to the testimony of EMT Wayne Bascle, Officer Troy Savage and detective John C. Miller, the following testimony was adduced at trial.
EMT VIVIAN SCHLOSSER:
Vivian Schlosser testified that defendant told her his brother was banging on the door and when he let him into the house a fight ensued. Danny began beating on him. She stated defendant told her that he showed that MF that he wasn't going to come in his house beating up on him and so he stabbed him.
VIRGINIA LYONS:
Virginia Lyons, defendant's mother, testified that she awoke at approximately 11:00 p.m. She heard her son Danny cry out, "Momma, come get him off of me". She got out of bed and went into the back bedroom where she found Danny lying across the bed with defendant on top of him. Danny, already stabbed, was struggling to get the knife from defendant. She and Danny succeeded in taking the knife from defendant. Then Danny fell back onto the bed. She stated Danny never used or carried a weapon and that she never instructed defendant not to open the door at night.
FRANKIE LYONS:
Frankie Lyons, defendant's brother, testified that he and Danny were drinking at the neighborhood bars from 6:00 p.m. to approximately 10:00 p.m. the night of the stabbing. On his way home, Danny walked Frankie to his (Frankie's) bus stop. He *596 stated he never saw Danny carry a weapon and he was not carrying one that night. He did testify, however, that Danny was known to engage in fights and street brawls. He stated that he and his mother once broke up a fight between Danny and defendant during which defendant "tried to get a screwdriver for him". He admitted that Danny drank heavily and had gotten into a fist fight with him on one occasion.
Frankie testified that he was afraid of defendant but not of Danny. He stated that after defendant returned from the Viet Nam war he often thought people were trying to hurt him. He testified that defendant once told him not to come to his (defendant's) house or he would blow him away. He stated that several times he brought defendant to the V.A. hospital and Charity hospital for treatment. He stated defendant "would get paranoid and he will hurt you." He testified that defendant shot Danny during a fight and sustained a gunshot wound to his own knee from a ricocheting bullet. He stated he had no knowledge of Danny attacking defendant with a baseball bat.
OLINDA LYONS SMOTHERS:
Olinda L. Smothers, defendant's sister, testified that she arrived at her mother's house the night of the stabbing just as the EMTS arrived. She observed Danny lying on the bed and heard the EMTS say that he had no vital signs. She saw defendant sitting on the living room sofa drinking a beer. He was very calm. When she asked him how he could kill Danny, he replied, "how could he attack me?" She testified that defendant was never the same after returning from Viet Nam and often hallucinated.
JUDY LYONS:
Judy Lyons, defendant's sister, testified she lived with Danny and defendant up until four months prior to Danny's death. She stated that the two brothers did not like each other and when they drank, "they just got into it". She stated defendant shot Danny five times during a fight only one month before the stabbing. During this same fight, defendant sustained a black eye. She stated that she often heard defendant say "every time I look in the mirror, I think about killing him." She testified that defendant often hallucinated since returning from Viet Nam. On one occasion he told her there were people outside when there were none. On other occasions he would say things like "come on baby, make love to me". Sometimes he knew what was real and sometimes he did not.
CAROLYN LYONS:
Carolyn Lyons, defendant's sister, testified that she often heard defendant threaten to kill Danny. She stated that after sustaining a black eye during a fight with Danny, she heard defendant say over and over that he "was going to kill him. He planned to kill him."
DR. ARIS COX:
Dr. Aris Cox, a forensic psychiatrist, testified that defendant had been diagnosed as paranoid schizophrenic. He further stated that as a member of the lunacy commission, he examined defendant twice and found him capable of standing trial.
DR. PAUL McGARRY:
Dr. Paul McGarry, a forensic pathologist, performed the autopsy on Danny Lyons. He described his injuries as a fatal stab wound to the chest, a defense wound to his right palm and a bruise on his lower lip. The fatal chest wound pierced the fifth rib which required a very forceful blow. He gave decedent's blood alcohol level at .21.
ELIJAH LYONS:
Defendant testified that hostilities existed between himself and Danny for two years prior to the night in question. Defendant stated that on one occasion Danny shot him in the leg and on another occasion hit him with a baseball bat.
He further testified that he did not get along with his brother Frankie because Frankie "uses drugs and he on two occasions attacked me claiming that somebody had paid him to attack me. And once he said somebody gave him drugs and some money for attacking me ...".
Defendant testified that on the night of the stabbing, he let Danny into the house *597 at approximately 10:15 p.m. and returned to bed. A short time later he heard Danny leave again. Then, at around 11:00 p.m. he heard a noise coming from the back bedroom. He took his knife and went to investigate. Upon entering the room, he saw Danny climbing through the window. As he turned to leave, Danny began screaming and hollering, grabbed him from behind and struck him in the back of the head. Fearing Danny had a weapon, defendant turned around and stabbed him in the chest. Defendant stated he knew Danny was hurt and wanted to call the police when another scuffle ensued and "everything was kind of confused." He testified that he was sorry after he stabbed Danny and called for an ambulance.
Defendant denied telling family members that he was going to do anything to Danny.
As to the taped statement and transcript, defendant testified that missing from the statement was (1) the conversation between himself and the arresting officer during which defendant requested an attorney, was told he didn't need one because it looked like self defense and that he probably would not be arrested; and (2) defendant's statements regarding Danny's previous violence against him. Defendant also complained that "most of the things that were said on there, I did not say them in that manner." Defendant denied saying he got the knife after the argument began claiming he already had the knife when he went to investigate the noise in the bedroom. Defendant stated he believed the tape had been altered.
Defendant admitted serving two years in prison for illegal use of a weapon and two years probation which was subsequently revoked for public drunkenness.
Defendant appeals his conviction and sentence asserting the following assignments of error:
1) Appellate counsel cannot provide effective appellate advocacy because the trial transcript is substantially incomplete.
2) The trial court erred in failing to admonish the jury following the prosecutor's reiteration of improper remarks.
3) The trial court erred in allowing the jury to read the transcript of defendant's taped confession despite defendant's allegation that the taped statement had been altered.
ASSIGNMENT OF ERROR 1:
Missing from the trial transcript are: the voir dire, the impaneling of the chosen jurors, the opening statements by the state and defense and a portion of the jury charges.
Article I, Section 19 of the Louisiana Constitution provides:
"No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." ...
Louisiana Code of Criminal Procedure Article 843 provides:
"In felony cases ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."
Louisiana Code of Criminal Procedure Article 914.1(A) provides:
"The party making the motion for appeal shall, at the time the motion is made, request the transcript of that portion of the proceedings necessary, in light of the assignment of errors to be urged." ...
Defendant requested, and this court ordered, that the record be supplemented to include the jury charges and defendant's closing argument. These were provided with the exception of a part of the trial judge's explanation of the "aggressor doctrine".[1] The incomplete instruction is as follows:

*598 "There's a theory in law called the `aggressor doctrine.' A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. In determining whether the defendant was the aggressor, you must consider the nature of the confrontation and whether the victim's actions were a reasonable response. Thus, if you find that the defendant was the aggressor or that he brought on a difficulty, you must reject his claim of self-defense, unless you find that he withdrew from the conflict and ..."
No specific error has been assigned to the missing portion of the jury charges. Defendant argues that because the record is incomplete, his new appellate counsel is unable to review for possible errors and therefore, justice requires that he be afforded a new, fully recorded trial. In support of his argument defendant cites State v. Ford, 338 So.2d 107 (La.1976). In reversing the defendant's conviction, the high court stated:
..."The Supreme Court has made it clear beyond question that a criminal defendant has a right to a complete transcript of the trial proceedings, particularly where, as here, counsel on appeal was not counsel at the trial. Hardy v. United States, 1963, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331. [U.S. v. Atilus] 425 F.2d 816 [(5th Cir.1970)].
Our Court has at least twice reversed convictions because of infirmities in the record available to the Court for review. In State v. Bizette, 334 So.2d 392 (La. 1976), we remanded a case for new trial when the recording equipment used at the trial malfunctioned, and we were unable to adequately review the trial court's denial of defendant's motion for acquittal. Likewise, in the case of State v. Rooney, 187 La. 256, 257, 174 So. 348 (1937), where both parties entered a joint motion to have the verdict annulled and the case remanded, we reversed defendant's conviction because of an incomplete record, stating:
`the transcript of the testimony taken in relation to the bills of exception reserved by the defendant is so defective and in such condition that it is impossible to present the case intelligently on appeal. Hence it appears to be in the interest of justice that the verdict and sentence should be set aside and the case remanded for a new trial.'
In Louisiana, as in the federal courts, an appeal from a felony conviction is an absolute right. La.Const. art. VII, Sec. 10 (1921); La.Const. art. V, Sec. 5(D)(2) (1974); Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Without a complete record from which a transcript for appeal may be prepared, a defendant's right of appellate review is rendered meaningless. A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction. But where a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully-recorded trial." at pps. 109-110. (emphasis added)
Ford is distinguishable from the instant case in that substantial portions of the Ford record were missing, to wit: examination of four state witnesses, the voir dire examination of the prospective jurors, the impaneling of the jurors and the prosecutor's opening statement.
The instant record contains eight pages of jury charges.[2] A review of these *599 charges shows the trial court was clear, concise and thorough and no objections were made. Applying the holding in Ford to the instant case and considering the overwhelming evidence of defendant's guilt, we find the missing portion of the jury charge to be an inconsequential omission which does not warrant a reversal of defendant's conviction.
Furthermore, we note that the record does not contain a request by defendant for a transcript of the voir dire, impaneling of the jury or opening statements. Defendant does not urge any specific error with respect to these portions of the trial other than the fact that they are missing. Again, considering the overwhelming evidence of defendant's guilt and the failure to request those portions of the record or designate specific errors with respect thereto, we find no reason to grant a new trial.
This assignment of error is without merit.
ASSIGNMENT OF ERROR 2:
Defendant asserts the prosecutor made improper and prejudicial remarks about the sentences' defendant could receive. Defendant complains that an objection was made after each remark but the trial court admonished the jury as to only one.
The record reflects the following:
BY THE COURT:
Anymore questions, Counsel?
BY MS. SKARPETOWSKI:
Yes.
BY MR. TEISSIER FOR THE DEFENSE:
Q. Yes, a couple, Your Honor. If you're found guilty of this crime, do you know the possible scenarios that you might have to go through?
BY DEFENDANT ELIJAH LYONS:
A. Yes, I'm aware that I could be sentenced up to 21 years in the penitentiary.
Q. And what about what happens to you if you're convicted of the crime and found not guiltywell, what if you're found not guilty by reason of insanity?
A. It's my understanding that if you're found not guilty by reason of insanity, then you areyou will then be committed to a insane asylum for an indefinite period and
BY THE COURT:
That's not accurate, sir. It's not an accurate statement of the law but go ahead.
BY DEFENDANT ELIJAH LYONS:
A. Well, this is the way I understand it. You would be sentenced to a insane asylum for an indefinite period with the stipulation that you would be examined every month until you are found cured or sane. And then you would be brought before a judge before you're released. And it is my understanding that the indefinite period could run anywhere from the first six months till the rest of your entire life.
Q. Did you want us to plead you not guilty by reason of insanity?
A. No, I did not.
*600 BY MR. TEISSIER FOR THE DEFENSE:
No further questions, Your Honor. I tender.

CROSS EXAMINATION BY THE STATE
EXAMINATION BY MS. OFFAN:
Q. So what you're telling this jury is that you don't want to receive treatment. If you haveif they find you have some kind of mental disorder, you don't's want to receive treatment for that, do you?
BY ELIJAH JONES:
A. If they find that I have some kind of mental disorder, then I would think I would need treatment. And I would be very grateful for them for looking out for my help. And I'd like that very much. But if they were to just say that I was insane, thinking that I would be getting away with a crime, no, I do not wish to be found insane. If they think a crime has been committed, then I would accept that and go to jail and do my time for it. And if they think that I'm ill, then they could put me in the hospital and I would be treated for it. But as far as being incarcerated in a mental institution for the rest of my lifefor potentially the rest of my life, no, I do not wish for them to do that.
Q. And you're 37 years old, sir?
A. Yes, I am.
Q. And do you understand that you can only be sentenced up until the longest length of time that you could be in so the most you would be in a mental facility, the absolute most would be 21 years? Do you understand that?
A. I wasn't aware of that. I was just told that it was an indefinite period, which could be translated to the rest of your natural life.
Q. But if I told you today
BY MR. TEISSIER FOR THE DEFENSE:
Objection, Your Honor.
BY MS. OFFAN FOR THE STATE:
Your Honor, could I as least get my entire question out before he objects?
BY MS. SKARPETOWSKI:
May we approach the Bench?
(There was a brief conference at the Bench.)
BY THE COURT:
Ladies and gentlemen of the jury, the Court is going to in its instructions to you that you're notit's not your concern what possible sentence or what possible disposition could be made with Mr. Lyon's, depending on what verdict you return. One of the problems of attorneys telling you the law is sometimes they misinterpret the law. Suffice it to say that both sides have misinterpreted what wouldthe realm of what could happen to this man if a verdict of not guilty by reason of insanity were returned. That's not your concern. It's that's a sentencing phase. That's not the concern of the jury, okay? Let's get onto something else.
BY MS. OFFAN FOR THE STATE:
Q. You told this jury that you could be incarcerated and it's your understanding that you could be if you are found guilty
BY MR. TEISSIER FOR THE DEFENSE:
Objection, Your Honor. We-I thought we just went through this.
BY MS. OFFAN:
Your Honor, if I might be able to finish my question, it might clear up.
BY THE COURT:
Finish your question.
BY MS. OFFAN:
Q. You said that if you were found guilty of this crime that you would be sentencedthat you could be sentenced up to 21 years, is that true?
BY DEFENDANT ELIJAH LYONS:
A. That is true.
Q. Isn't it also true that you could receive a suspended sentence and receive probation. There's no minimum jail time in this case.
BY MR. TEISSIER:
Objection, Your Honor. Objection, Your Honor.
BY MS. SKARPETOWSKI FOR THE DEFENSE:

*601 Objection, Your Honor, she's definitely misquoting the law, considering the fact that the defendant has a prior conviction.
BY MR. TEISSIER:
We just went overwe just went over this, Your Honor. You said that
BY MS. OFFAN:
It's within the purview
BY THE COURT:
All right, look, let's get away from sentencing. That's the purview of the Court. Let's get onto some relevant questioning during cross-examination of the witness if you intend to cross-examine. I've had enough of getting into sentencing. Except you're not doing anything but confusing the jury about things that's notthat they shouldn't be concerned with in making their decision.
The record clearly reflects that the prosecutor's remarks were based on testimony first illicited by questioning from defense counsel and was already before the jury. See, State v. Paul, 499 So.2d 1288 (La.App. 4th Cir.1986), writ den. 503 So.2d 475 (La. 1987).
While we agree the prosecutor should not have repeated the remarks after the admonition by the court, these remarks do not fall within the specific grounds for a mistrial nor do they constitute conduct so prejudicial as to deny defendant a fair trial. C.Cr.P. Articles 770 and 775.
This assignment of error is without merit.
ASSIGNMENT OF ERROR 3:
Defendant asserts it was reversible error for the trial judge to allow the jury to read the transcript of his taped confession while listening to the tape.
It has long been held that a transcript of a taped statement is admissible over a best evidence objection since the transcript provides the jury with a convenience in following the playback of the taped confession. State v. Snedecor, 294 So.2d 207 (La.1974).
Defendant seeks to distinguish Snedecor by arguing that once the truth of the confession is in dispute, the transcript should not be given to the jury as it may lend credence to the material on the tape. See, State v. Burdgess, 434 So.2d 1062 (La.1983).[3]
First, we observe that defendant does not assert as error the admission of his taped confession into evidence. We find no jurisprudence or statutory law that condemns the reading of the transcript of a taped confession under these circumstances. Moreover, defendant has made no showing that the transcript differed in anyway from the audio tape or that it dramatized or influenced in anyway the jury's understanding and assessment of the taped confession.
The jury heard all the testimony relative to the authenticity of the taped confession and chose to believe the witnesses for the State. The credibility of the witnesses is for the trier of fact to determine. State v. Lee, 458 So.2d 533 (La.App. 4th Cir.1984).
This assignment of error is without merit.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The official court reporter informed this court that she was unable to provide the entire jury instructions because one of the January 11, 1989 tapes was missing.
[2] Included in these eight pages are instructions to the jury: not to single out any particular instructions; to disregard any impression they might have that the judge has an opinion regarding the defendant' guilt or innocence or any fact in the case. The judge further instructed the jury as to reasonable doubt; that the evidence to be considered is only that admitted during the trial, not that which they were instructed to disregard or to which an objection was sustained; evaluation of testimony; direct and circumstantial evidence; justifiable homicide; self defense; and the aggressor doctrine. In addition, the trial court instructed that the bill of information and statements and arguments by counsel is not evidence; that the jurors were not to be influenced by prejudice, sympathy or passion, that if the state offers evidence of a statement by the defendant, to consider whether it was freely and voluntarily made without influence of fear, duress, threats, intimidation or promise; if defendant offered evidence of good character, it must be considered as part of the evidence, if, however, the jury finds that the state has proven guilty beyond a reasonable doubt, the jury as the duty to find him guilty even though there may be evidence of good character, evidence of the commission by defendant or offenses other than that for which he is on trial is to be considered only for the limited purpose of whether it tends to show intent; defendant may not be found guilty of this offense merely because he may have committed other offenses; evidence that a witness was previously convicted of a crime is a circumstance the jury may consider, along with all other evidence, in deciding whether to believe any or all of that witness' testimony; prior inconsistent statements are admitted only to discredit a witness, not to show veracity of the statements; jurors should consult with one another and consider each other's views and discuss the evidence to reach a just verdict; each juror must decide the case for him or herself.
[3] This same issue was raised in Burdgess. The Supreme Court did not reach the issue because the only objection raised was that the transcript was repetitive.