NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1061

STATE OF LOUISIANA

VERSUS

MARLON ROBERSON

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 09-1697
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Billy Howard
Ezell, Judges.

AFFIRMED.

J. Phillip Haney
District Attorney, Sixteenth Judicial District Court
Angela B. Odinet
Assistant District Attorney
300 Iberia Street, Suite 200
New Iberia, LA 70560
(337) 369-4420
COUNSEL FOR APPELLEE:
        State of Louisiana

Jermaine Demetrie Williams
Attorney at Law
108 W. Congress Street
Lafayette,, LA 70501
(337) 235-3989
COUNSEL FOR DEFENDANT-APPELLANT:
        Marlon Roberson

**PICKETT, Judge.**

## STATEMENT OF FACTS

At trial, the presentation of evidence began with a recitation that the state and the defense stipulated the defendant, Marlon Roberson, had been convicted of distributing cocaine in St. Mary Parish on May 11, 1998, and that the defendant had been sentenced for that offense on November 23, 1998.

The prosecution called Deputy Sheriff George Hollis as its first witness. In the course of his duties, Deputy Hollis responded to a call at around 3:30 or 4:00 a.m. at Iberia Medical Center on July 15, 2009. The hospital had reported that a patient there had shot himself in the hand. When Deputy Hollis entered the emergency room, he encountered the defendant as he was exiting the x-ray room. The hospital calls the Sheriff's Office any time someone arrives there with a gunshot or stab wound. Deputy Hollis began an interview with the defendant in order to ascertain what had happened. The defendant said he had shot himself in the hand when he was trying to unload a pistol he retrieved from his girlfriend's house. The defendant explained that he had found the black automatic .40 caliber pistol in a ditch on Norris Road two weeks prior to the incident. When questioned further about the pistol, the defendant said he had found it around noon one day when he was walking to the gas station. Later, the defendant said he found the handgun around 8:00 p.m.

Deputy Hollis found the circumstances suspicious:

> When he told me [he] had found the weapon in the ditch, I wanted to know more about that. It just seemed suspicious that he had found a weapon in a ditch. So I asked him about it and he told me it happened - that he found it about noon when he was walking to the gas station. And then later he said it was like 8 o'clock in the evening. So I became suspicious about the weapon and I was

wondering - Also, he couldn't tell me the make or model of the weapon. He said he didn't know, which I was suspicious because, you know, you would know that about a weapon you possessed. So then my thought was maybe the weapon was stolen; or, if he did find it in a ditch, why didn't he call us and then let us know he had found a weapon in the ditch. I wanted to find the weapon because maybe it had been used in a previous crime and thrown into the ditch. So the trailer park where his girlfriend's house was located was about thirty (30) to forty (40) trailers in the area. So I called the Parish Supervisor to go to where the trailer park is and to where his girlfriend's residence was to see if he couldn't locate the pistol on the ground somewhere in the area and secure the weapon.

The defendant's girlfriend at the time was Demetrius Spencer.[1] Deputy Hollis spoke with Ms. Spencer and also Eric Jones, who was the defendant's friend. Mr. Jones had gone to the hospital because someone called him and informed him that the defendant had shot himself in the hand. Deputy Hollis said Ms. Spencer reported that she did not know where the gun was located.

Deputy Hollis related that, after speaking with Ms. Spencer and Mr. Jones, he went to Ms. Spencer's residence, the location where the defendant had supposedly shot himself, in an effort to locate the pistol. Mr. Jones also appeared at the scene. He said he went there to check up on Ms. Spencer's children. This made Deputy Hollis suspicious because he had been informed at the hospital that Ms. Spencer's children were not home. Based on his suspicions, Deputy Hollis ran a background check on both Mr. Jones and the defendant. Deputy Hollis discovered that the defendant had a prior conviction for possession of a controlled dangerous substance with intent to distribute. As a convicted felon, the defendant was not permitted to possess a firearm. Deputy Hollis was unable to locate the firearm, so he returned to the hospital and arrested the defendant for being a felon in possession of a firearm.

---

[1]The record refers to Defendant's girlfriend both as "Demerits" and "Demetrius."

Deputy Hollis reported that the defendant changed his story after he was arrested. The defendant's new explanation for his injury was that he had been robbed and that the robber had shot the defendant as the defendant ran away. The defendant refused to give any more details about the robbery or the robber because he did not "rat" on people. The defendant's gunshot was a flesh wound at the bottom of his left palm.

On cross-examination, Deputy Hollis testified that, wherever his original report conflicted with his testimony at trial, the report should be believed. During his investigation, Deputy Hollis also spoke with Marcus Roberson, the defendant's brother. Deputy Hollis never saw the defendant in possession of a gun. When Deputy Hollis was speaking to Ms. Spencer and the defendant, Mr. Jones left the hospital, took Ms. Spencer's car, drove to the Spencer residence, parked a few houses away from the trailer, and encountered Sergeant Lemaire as Mr. Jones approached the residence.

Deputy Hollis did not remember what Mr. Jones looked like. He remembered the defendant because the defendant was present in court. Deputy Hollis did not have an independent recollection that the defendant was the person he talked to at the hospital.

On redirect examination, Deputy Hollis said he had arrested Marlon L. Roberson, born November 8, 1979, who lived at 611 Tenth Street in Franklin, Louisiana. The arrestee was a black male. Deputy Hollis arrested the defendant based on what the defendant and others told him. The defendant said he had shot himself in the hand. The defendant had initially armed himself to search the area for a suspicious vehicle because he feared for his safety. After not being able to

find the suspicious automobile, the defendant shot himself while unloading the gun.

Deputy Hollis said that Mr. Jones was in the defendant's company when Deputy Hollis first saw the defendant leaving the x-ray lab. Mr. Jones appeared to be present to support the defendant. The defendant did not seem to be afraid of Mr. Jones or afraid in general.

Jamie Beard, an emergency room nurse at Iberia Medical Center, was the state's second witness. On July 15, 2009, around 3:30 or 4:00 a.m., Nurse Beard treated a patient for a gunshot wound to the left hand. As it was a gunshot wound, Nurse Beard was required to report the injury, so she called the Sheriff's Office while the defendant was being treated. The patient was an African-American male named Marlon Roberson and born November 8, 1979.

Nurse Beard said that the injury was to the patient's left palm. Since her employment commenced in January 2007, she had seen twenty to thirty gunshot wounds. Her observation of the defendant's wound was consistent with the other gunshot wounds she had seen. At trial, Nurse Beard vaguely recognized the defendant, but she did not have an independent recollection of a specific instance when they met. Nurse Beard just remembered the defendant as someone she had treated.

Elton "Tony" Trahan, a parole and probation officer, was the third witness to testify for the prosecution. As part of his job, Officer Trahan supervised Marlon Roberson. He identified the defendant in court as Marlon Roberson. Officer Trahan supervised the defendant for a May 11, 1998 distribution of cocaine conviction in St. Mary Parish. The defendant's birthdate was November 8, 1979. At the time of his arrest for distribution of cocaine, the defendant was living at 611

4

Tenth Street in Franklin. The defendant was discharged from probation on February 11, 2000, following a revocation hearing. Had the defendant met all the requirements of his probation, he would have been released from probation on November 23, 2003.

Following Officer Trahan's testimony, the state asked the trial court to have the defendant show the jury his left palm. The district court ordered the defendant to raise his left hand and slowly walk in front of the jury so that they could see his palm. The trial court then instructed the defendant to show it the same palm. Following this demonstration, the state rested subject to rebuttal.

The defendant recalled Deputy Hollis to testify as the sole witness on behalf of the defense. When Deputy Hollis asked a person questions, such as date of birth, he wrote it down in his notes. Deputy Hollis would not necessarily write it down in his narrative. Deputy Hollis testified he was not sure whether he got the defendant's address from the defendant, from the NCIC database when he ran the background check, from the defendant's identification, or from the hospital medical report. Deputy Hollis explained that he would have needed the defendant's birth date prior to running an NCIC background search because that was a system requirement. Deputy Hollis said he corroborated the information with the defendant: name, address, and date of birth.

The state then called Ms. Spencer as a rebuttal witness. Ms. Spencer said he knew someone named Marlon Roberson, and identified the defendant was Marlon Roberson. On July 15, 2009, Ms. Spencer lived on Norris Road in New Iberia. The defendant was Ms. Spencer's boyfriend at the time. Ms. Spencer gave a police statement in reference to the incident. She testified that the defendant knocked on her door in the early morning hours. She thought she heard a gunshot prior to the

defendant knocking on her door. When she went to the door, the defendant said he had shot himself. The defendant was injured, so she went inside the house, retrieved a towel, wrapped his hand, and drove him to the hospital, Iberia Medical Center. Ms. Spencer spoke with an officer about the incident. She did not recall the officer's name, but she remembered what he looked like.

On cross-examination, Ms. Spencer said that the defendant was living with her at the time of the incident. He had been living there for five to six months. Ms. Spencer never saw the defendant in possession of a gun. Ms. Spencer thought she would have known if the defendant had a gun in her house. She went through his belongings because she suspected he was cheating on her. Ms. Spencer overheard the defendant tell the nurse, the hospital staff, and the law enforcement officer the same story; that he shot himself in the hand. The people at the hospital were the defendant, Ms. Spencer, and Marcus; Ms. Spencer said she did not know Marcus's last name. Ms. Spencer did not know Marcus Roberson, and she did not know an Eric Jones. Ms. Spencer was acquainted with Courtland Hall, who was also at the hospital that morning.

On redirect examination, Ms. Spencer said the defendant never mentioned to her that he had a gun. The state introduced Ms. Spencer's police statement into the record. The state rested its rebuttal.

The defense then requested permission to call additional witnesses. The defense first called Courtland Hall to testify. Mr. Hall said he knew the defendant for approximately seven or eight years before trial. Mr. Hall remembered July 15, 2009. The evening before, Mr. Hall and the defendant were "hanging together." Mr. Hall did not see the defendant after he dropped Mr. Hall off at home around 5:00 or 6:00 p.m. At that time, he said the defendant was not in possession of a

6

gun or a concealed weapon. Later on, the defendant called Mr. Hall, asked him to meet him at the hospital, and explained that he had shot himself. The defendant called Mr. Hall around 3:00 or 3:30 a.m. on July 15, 2009.

Mr. Hall said he went the Iberia Medical Center and met the defendant there. Mr. Hall did not know an Eric Jones, and to Mr. Hall's knowledge, there was no Eric Jones present at the hospital. Mr. Hall also said he did not know anyone named Marcus Roberson, but he did know a guy whose first name was Marcus. Mr. Hall did not know Marcus's last name, and Mr. Hall did not see Marcus at the hospital. Mr. Hall was not present when the police officers arrived at the hospital, but he was there when they questioned the defendant. The defendant told the officer that he had found the gun, and when he picked it up, it went off and shot the defendant. Mr. Hall did not hear the defendant state that he had found the gun two weeks before the shooting.

Mr. Hall maintained that he would have known if the defendant had a gun, and Mr. Hall did not recall the defendant having a gun during the two weeks preceding the incident. Mr. Hall did not remember the defendant saying about where he found the weapon. Mr. Hall left ten or fifteen minutes after the police arrived. At the defendant's request, Mr. Hall went to Ms. Spencer's house to make sure the door was locked. When he arrived, an officer stopped him at the entrance to the trailer park. The officer told him that he could not go there because they were still investigating, so Mr. Hall left and returned to the hospital. Mr. Hall recognized Deputy Hollis, but he only saw Deputy Hollis when the deputy first arrived at the hospital.

The defendant then testified on his own behalf. The defendant reported that he lived at 611 J.A. Hernandez in Franklin. The defendant said he had lived there

with his mother for twenty years. The defendant stated that, after he dropped off Mr. Hall, he cheated on Ms. Spencer. Around 3:00 a.m. on July 15, 2009, the defendant drove to Ms. Spencer's home and stopped there. The defendant was standing outside the trailer park, smoking a cigarette, and chatting with the woman he had just left when he saw the gun. Knowing there were children in the trailer park, the defendant ended his call with his lover and picked up the handgun. When the defendant grabbed it, it went off, so the defendant dropped the gun, grabbed his hand, ran to Ms. Spencer's house, and banged on the door. When she answered the door and asked what happened, he told her he made a mistake and shot himself.

The defendant related that he picked up the gun to get it out of harm's way. He intended to call the police and report that he had found the weapon. The defendant asserted that he thought he was doing the right thing. The defendant said he did not have a chance to call the police because he shot himself. Ms. Spencer wrapped his hand in a towel and brought him to the hospital. At his request, Ms. Spencer called Mr. Hall, who was the defendant's close friend. The defendant went to Iberia Medical Center, which was the same place he went following a later motorcycle accident.

The defendant said that Deputy Hollis was the first officer to appear. He admitted he told Deputy Hollis that he had shot himself, but he did not want to make a statement right then because he was in pain. Deputy Hollis then asked Mr. Hall and Ms. Spencer what had happened. The defendant did not remember telling Officer Hollis that he had believed someone was following his vehicle. The defendant said he thought he would remember such a statement, and he denied ever saying such a thing. Deputy Hollis left while Defendant, Mr. Hall, and Ms. Spencer all remained at the hospital. Later on, Deputy Hollis returned to the

8

hospital and arrested the defendant. The defendant remembered being read his *Miranda* warning after his arrest but not before Deputy Hollis arrested him.

The defendant maintained that he had discovered the gun in the cow pasture across the street from Ms. Spencer's trailer on July 15, 2009. It was not in a ditch. It was a drainage area between the fence and the pavement.

On cross-examination, the defendant said he was aware that he was not allowed to possess a firearm as a result of his prior conviction. The defendant stated that he told his female friend that he would call her back. He did not inform her that he had found a gun. The defendant asserted that he attempted to pick up the gun, but it went off as he gripped it with his right hand. The state asked the defendant whether he had picked up the gun, but the defendant said it was not actually in his hand when it went off. The defendant tried to avoid saying he picked up the firearm, but, at length, he finally admitted that he had picked up the weapon. The defendant then said that he possessed the firearm. He was not being robbed at the time, and he was not defending himself, and there was no imminent danger. The defendant was by himself; there were no other people, including children, around him at the time. The defendant had a cell phone, and he intended to call the police about his discovery. The defendant then protested that he did not know he was not supposed to have possession of a gun because it had been ten years since the end of his parole. The defendant conceded that he could have called the police first and stood near the gun until they arrived. He said he did not think of that option.

The defendant claimed that Deputy Hollis was lying when he said the defendant told him that the defendant said it was a .40 caliber gun. Deputy Hollis was not lying when he said the defendant reported shooting himself. Further,

9

Deputy Hollis lied when he related that the defendant informed him that the defendant had found the gun in a ditch two weeks prior to the incident. The defendant maintained he never mentioned a suspicious vehicle to Deputy Hollis and never said he had retrieved the weapon from Ms. Spencer's house. The defendant said, furthermore, he did not change his story when Deputy Hollis arrested him. The defendant denied saying he was shot during a robbery.

The defendant said his final release date from the Department of Corrections for his distribution conviction was in July 2009. This event also happened in July 2009. It happened within a month of his release date. In addition to his prior distribution conviction, the defendant was convicted of possession of a firearm by a convicted felon in December 1999.

On redirect examination, the defendant denied knowing anyone named Eric Jones and said that there was no Eric Jones at the hospital with him. The defendant testified that Deputy Hollis had to be lying. The defendant maintained that he had picked up the gun to get it out of the way; he did not intend to keep it.

On August 31, 2009, the state charged the defendant with one count of being a convicted felon in possession of a firearm, in violation of La.R.S. 14:95.1. At arraignment, the defendant pled not guilty. Following trial on the merits, the jury, on July 14, 2010, found the defendant guilty as charged.

On August 3, 2010, the state filed a multiple offender bill, and the defendant appeared for a habitual offender hearing on February 16, 2011. After hearing the evidence presented, the district court adjudicated the defendant to be a second felony offender, sentenced him to serve eighteen years at hard labor without benefit of probation, parole, or suspension of sentence, and credited him with time served.

10

The defendant now appeals.

## ASSIGNMENTS OF ERROR

1. The Defendant is entitled to a new trial because the transcript is incomplete and inaccurate.

2. The Trial Court erred when it allowed impermissible rebuttal testimony.

3. The Defendant's constitutional rights were violated when he was not afforded a speedy trial.

4. The Trial Court erred when it failed to include general intent as an element of the crime the Defendant was charged with.

5. There was insufficient evidence to support a finding of guilt.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER FIVE[2]

The defendant argues, "there was insufficient evidence to support a finding of guilt." The defendant contends that the state failed to prove that it was the defendant who presented himself to the emergency room on July 15, 2009, after shooting himself in the hand. The prosecution also failed to introduce evidence concerning the defendant's intent.

The state responds that the jury had the opportunity to hear the evidence, make credibility determinations, and to weigh the evidence presented at trial. The

_____

[2]"When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992).

state advises that this court should not overturn the credibility determinations made by the jury.

The Louisiana Supreme Court has set forth the standard for reviewing sufficiency of the evidence:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)[.] A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

"It is unlawful for any person who has been convicted of . . . any violation of the Uniform Controlled Dangerous Substances Law which is a felony, . . . under the laws of this state, . . . to possess a firearm or carry a concealed weapon." La.R.S. 14:95.1(A) (footnote omitted). "The provisions of this Section . . . shall not apply to any person who has not been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence." La.R.S. 14:95.1(C).

In cases where a defendant has been in physical possession of the firearm, the defendant's intent to possess the firearm is proven through the actual possession of the weapon:

> To convict of possession of a firearm by a convicted felon, the state must prove: (1) the possession of the firearm; (2) a previous felony conviction; (3) absence of the ten-year statutory period of limitation; and (4) general intent to commit the offense. La. R.S.

14:95.1; *State v. Husband*, 437 So.2d 269 (La.1983)[.] The general intent to commit the offense may be proved through the actual or constructive possession of the firearm. *State v. Johnson*, 2003-1228 (La.4/14/04), 870 So.2d 995. Whether the proof is sufficient to establish possession of the firearm turns on the facts of each case. Further, guilty knowledge may be inferred from the circumstances of the transaction and proved by direct or circumstantial evidence.

*State v. Drayton*, 46,191, p. 8 (La.App. 2 Cir. 4/13/11), 63 So.3d 319, 324 (citation omitted).

The evidence most favorable to the prosecution shows that the defendant, unanimously identified by all witnesses at trial, found a handgun, picked it up, accidentally shot himself in the hand, and had his girlfriend drive him to Iberia Medical Center for treatment. Law enforcement only learned of the incident after the hospital medical staff reported the matter to the Iberia Parish Sheriff's Office. The defendant had completed his sentence, probation, parole, or suspension of sentence for distribution of cocaine in July 2009, which was the same month wherein the incident with the firearm occurred.

Though the defendant presented a "good citizen" defense, he failed to prove a viable defense under the justification provisions set forth in La.R.S. 14:18:

The jurisprudence has developed a doctrine of "necessity" which expands the realm of justification, but this theory has a very limited application in felony firearm possession cases. "Necessity," when raised as a defense to the illegal possession of a firearm, entails proof that the threat of force by another is imminent and apparent, and that the person threatened has no reasonable alternative but to possess the firearm. Justification is an affirmative defense which the accused must establish by a preponderance of the evidence.

*State v. Shed*, 36,321, p. 6 (La.App. 2 Cir. 9/18/02), 828 So.2d 124, 129, *writ denied*, 02-3123 (La. 12/19/03), 861 So.2d 561 (citations omitted). The defendant also urged that he thought he could legally possess a firearm since it had been ten years since his conviction. Mistake of law, however, is only a defense under

13

certain circumstances, and the defendant failed to show that those circumstances fit his case. La.R.S. 14:17.

Therefore, when the evidence is viewed in the light most favorable to the prosecution, there was sufficient evidence to support the defendant's conviction. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant asserts he "is entitled to a new trial because the transcript is incomplete and inaccurate." The defendant urges that the appellate record is incomplete because there were instances where the court reporter was unable to transcribe objections by either side and bench conferences. Additionally, argument by counsel germane to the case was completely missing from the transcript such as the objections and arguments made by defense counsel during the testimony of a state's rebuttal witness. The defendant maintains that the incomplete transcript makes it impossible to determine the nature of counsel's objections, the decisions of the trial court, and whether the issues were properly preserved for appeal.

The defendant advances that the practice of the trial court to hear arguments of objections outside of the jury's hearing does not eliminate the trial court's duty to ensure that the bench conferences were recorded. The defendant posits that the district court failed to meet its duty in the instant case as there were multiple instances where bench conferences were not recorded. The defendant argues that this court should, therefore, vacate his conviction and sentence and order a new trial.

The state replies that a complete review of a defendant's conviction and sentence can be accomplished even when portions of the trial record are missing. The state continues that the defendant is not entitled to relief unless he can show he

14

was prejudiced by the missing portions of the record. Furthermore, there is no rule requiring trial courts to record bench conferences; the rule only applies to objections made in open court. The state urges that the defendant fails to prove that he was prejudiced as he failed to proffer evidence concerning the contents of the bench conferences. Additionally, the record does not show a request by the defense to have the bench conferences made part of the record during trial.

The Louisiana Constitution guarantees defendants judicial review based upon a complete record: "No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived." La.Const. art. 1, § 19. This right is also preserved by La.Code Crim.P. art. 843: "In felony cases, . . . the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

The supreme court has discussed this constitutional right:

> Both this court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial proceedings, particularly, where, as here, appellate counsel was not counsel at trial. *See Hardy v. United States*, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964); *State v. Robinson*, 387 So.2d 1143 (La.1980). Further, in Louisiana, a defendant is constitutionally guaranteed the right of appeal "based upon a complete record of all the evidence upon which the judgment is based." La. Const. art. I, § 19. Thus, material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. *See State v. Landry*, 97-0499 (La.6/29/99), 751 So.2d 214 (finding appellate record so deficient that the court could not properly review the case for error); *Robinson*, *supra* (holding that reversal required when record failed to contain the testimony of a state and defense expert witness); *State v. Ford*, 338 So.2d 107 (La.1976) (determining that reversal required when record was missing the testimony of four state witnesses and the voir dire of prospective jurors).

15

On the other hand, inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may nonetheless be adequate for appellate review. *See State v. Castleberry*, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773[.] Finally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. *Castleberry*, *supra* (holding that the defendant failed to show any prejudice resulting from bench conferences not being transcribed and, therefore, there was no reversible error)[.]

*State v. Deruise*, 98-541, pp. 10-11 (La. 4/3/01), 802 So.2d 1224, 1234, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283 (2001)(citation omitted).

However, court reporters are not necessarily required to record bench conferences:

This court has never articulated a *per se* rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I. § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.

*State v. Hoffman*, 98-3118, p. 50 (La. 4/11/00), 768 So.2d 542, 586-87, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000) (citations omitted) (footnote omitted).

Though the defendant argues that the omissions make it impossible to determine what the objections were and points out several instances where bench conferences were omitted from the record, he fails to point out specific arguments or assignments of error that he was prevented from arguing on appeal due to absence of those bench conference transcripts. Two transcript locations listed in the defendant's appellate brief reference objections made by the state. One record reference with a missing bench conference occurred in the lull between witnesses. Two transcript locations reference a recorded and transcribed bench conference,

and two of the record references show three unrecorded bench conferences; however, the basis for those objections appears to be stated on the record. The defendant fails to show he was prejudiced by the transcript omissions.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant claims, "the Trial Court erred when it allowed impermissible rebuttal testimony." The defendant argues that the state improperly used rebuttal testimony to introduce new issues and facts. Defendant asserts that, at trial, the defense called only one witness. The defense called Deputy Hollis for the purpose of reaffirming that he had been unable to identify the defendant as the person to whom he spoke to in the emergency room on July 15, 2009. Thereafter, the state called Ms. Spencer as a rebuttal witness and elicited information about the statement she had given Deputy Hollis on July 15, 2009, and elicited testimony from Ms. Spencer that she had brought the defendant to Iberia Medical Center early that same morning for a gunshot injury. The defendant posits that this was tantamount to the state reserving part of its case in chief for rebuttal. The defendant asks this court, therefore, to remand the case.

The state responds that the trial court did not err in allowing rebuttal testimony. The state advances that the defense opened the door for the rebuttal testimony. The state also claims that the testimonies of Ms. Spencer and Deputy Hollis were intrinsically linked as both offered information about the defendant's presence at Iberia Medical Center.

"The . . . state in a criminal prosecution shall have the right to rebut evidence adduced by their opponents." La.Code Evid. art. 611(E).

17

> The prosecution is entitled in rebuttal to explain, repel, counteract, or contradict evidence adduced by the defense. It may not, however, introduce new issues or facts, or reserve part of its case-in-chief for rebuttal. *State v. George*, 95-0110 (La.10/16/95), 661 So.2d 975, 981. Control of the evidence presented by the state on rebuttal is within the sound discretion of the trial court and will not be disturbed except in extreme cases, such as when evidence is kept back deliberately for purposes of deceiving and obtaining undue advantage. *State v. Williams*, 445 So.2d 1171, 1181 (La.1984).

*State v. Delco*, 06-504, pp. 13-14 (La.App. 1 Cir. 9/15/06), 943 So.2d 1143, 1151, *writ denied*, 06-2636 (La. 8/15/07), 961 So.2d 1160.

The record shows that the defendant's stated purpose for calling Deputy Hollis to testify was on the issue of identification. Ms. Spencer's direct rebuttal testimony included the information that she knew the defendant and that she knew the defendant was the person at the hospital with the gunshot wound in his hand because she was the person who drove him there for treatment. That evidence was relevant to the defendant's identity as the person at the hospital. Other evidence adduced from Ms. Spencer's direct rebuttal testimony was that she had given a police statement to the investigating officer. The police statement was also relevant to the issue of the defendant's identity as it contained a brief statement that, "I was sleep[ing,] and Marlon came home[.] I he[a]rd a gun shot[,] and [I] went out side[.] Marlon [was] bleeding[.] I got a towel, and [I] got him to the hospital."

The defendant's identity was established in the state's case-in-chief. At that point, the defense's trial strategy encompassed casting doubt on whether the defendant was the person who appeared at the hospital with a self-inflicted gunshot wound. Ms. Spencer's testimony showed that she could clearly identify that person as the defendant. Thus, Ms. Spencer's testimony was offered to counteract Deputy Hollis's statements during the defense's case-in-chief that he had no

18

independent recollection of whether the defendant was the Marlon Roberson to whom he spoke at the hospital. Therefore, Ms. Spencer's testimony did not constitute a reservation of part of the prosecution's case-in-chief, and the district court did not abuse its discretion by allowing the rebuttal evidence.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant contends his "constitutional rights were violated when he was not afforded a speedy trial." The defendant complains that the court reporter had initially been unable to locate the trial recording and, therefore, unable to produce a trial transcript on or before the June 6, 2011, lodging date for the appellate record. The defendant continues that this court granted two extensions to the court reporter without providing notice to the defense. The defendant postulates that the ex parte grant of extension of time in which to lodge the appellate record violated his constitutional rights; therefore, his conviction and sentence must be vacated. The defendant cites no legal support for this argument.

The state replies that, as there is no constitutional right to a speedy appeal, this assignment of error is without merit. The state points out that the defendant cites no legal authority for this argument. Furthermore, the delay was not significant as the lodging of the appeal record was less than two months.

The supreme court has addressed this issue and determined that, without a showing of prejudice, there has been no due process violation:

> Defendant additionally argues the delay [between his verdict and his appeal] violated his due process right to a speedy trial. The federal Fifth Circuit Court of Appeals has recognized that a state could violate due process if it substantially delayed the appellate process it provided for convicted criminal defendants. *Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981). Courts considering whether

19

inordinate delay in the appeals process constitutes a violation of due process should be predominantly concerned with whether the defendant was prejudiced. *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208, 1225-1226 (1983). In deciding this issue, some courts focus on the similarities between a defendant's interest in a speedy trial and his interest in a speedy appeal and apply the four-factor test balancing test developed for speedy trial violations. *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir.1994). Defendant contends under any analysis, he was substantially prejudiced by the delay. In evaluating the prejudice to the defendant in the appellate context, the court focuses upon: (1) oppressive incarceration pending appeal, (2) the anxiety and concern of the convicted person awaiting the outcome, and (3) impairment of the convicted person's grounds for appeal or the viability of his defense in the event of retrial. *Id.* Defendant avers he meets all of these factors, and particularly is unable to press claims in the same manner he could have pressed them had he received a reasonably timely appeal.

We have long held the constitutional right to a speedy trial, guaranteed by the Sixth Amendment to the United States Constitution and LA. CONST. art. I, § 16 (1974), does not extend to the appellate stage. *State v. Johnson*, 363 So.2d 458, 460 (La.1978); *State v. Lane*, 302 So.2d 880, 887-888 (La.1974). Thus, defendant's right to due process has not been compromised. Defendant correctly observes that some courts have recognized due process can be denied by substantial retardation of the appellate process. Nonetheless, even if an unreasonable delay could conceivably prejudice a defendant's right to a proper review of his claims, this defendant has done nothing to show how delay prejudiced his appeal.

*State v. Sparks*, 88-17, pp. 80-82 (La. 5/11/11), 68 So.3d 435, 493-94 (footnote omitted), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___ (2012). The record in the instant case was lodged with this court on or about August 30, 2011, so the delay was less than three months. The defendant fails to establish, in detail, how this delay prejudiced his right to appellate review.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

The defendant urges, "the Trial Court erred when it failed to include general intent as an element of the crime the defendant was charged with." The defendant alleges that he requested that the district court include the following jury instruction in the jury charges: "[p]ossession of a firearm by a convicted felon requires proof of: (1) the possession of a firearm; (2) a previous conviction of an enumerated felony; (3) absence of the 10-year period of limitation; and (4) general intent to commit the offense." The defendant protests that the district court's jury instructions concerning specific and general intent were not sufficient. The defendant also complains that, when the jury asked for further explanation concerning attempted possession, the trial court did not restate the definitions of general and specific intent. The defendant contends that he is entitled to have his conviction and sentence set aside on this basis.

The state responds that there was no error in the trial court's refusal to include the special jury instructions. There is no requirement that an element of an offense must be explained at a certain time or place in the jury instructions, and the defendant acknowledges that the information was included in the jury instructions. As a whole, the trial court's jury instructions correctly charged the jury; therefore, reversal is not applicable in this case.

With certain limitations, the trial court is required to give special charges requested by either the state or the defense:

> The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.

21

A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.

La.Code Crim.P. art. 807.

The record shows that, prior to charging the jury, the district court asked whether either party objected to the instructions. In reply, the defense requested the elements of the offense be altered to add the requirement of general intent:

> Your Honor, in your instructions concerning possession of a firearm by a convicted felon, I am looking at the very first page, Your Honor. About halfway down, you say, "Thus, in order to convict the defendant of the offense charged, you must find 1, 2, and 3. ." We would submit to the Court that there are four (4) elements to this crime and the 4th element being general intent. We submitted it to the Court. We have given the Court Circuit Court cases. They are Supreme Court cases that says [sic],
>
> > "To prove a violation of Revised Statutes 14:95.1, the State must establish beyond a reasonable doubt: 1) the defendant possessed a firearm; 2) a previous conviction of an enumerated felony; 3) the absence of the 10-year period of limitation; and 4) the general intent to commit the offense."

The trial court denied the defendant's request because it was already contained in the general charges: "Well, I give the instruction of general intent in my general charges. . . . It is sufficient. It is not required to be given here."

Subsequently, in charging the jury, the district court gave the following instruction on intent:

> Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act, or failure to act. General criminal intent is present when the circumstances indicate that the defendant must have averted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
>
> General criminal intent is always present is always present [sic] when there is specific intent. Whether criminal intent is present must

22

be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances. You may infer that the defendant intended the natural and probable consequences of his actions.

In explaining the elements of the offense, the trial court charged the jury that, "It is unlawful for any person who has been convicted of any violation of the controlled dangerous substance law, including distribution of cocaine, to possess a firearm." The district court then elaborated on what facts the jury must find in order to convict the defendant:

> Thus, in order to convict the defendant of the offense charged, you must find first that the defendant was convicted on distribution of cocaine on May 11th, 1998 in St. Mary Parish, and that subsequent to that conviction[,] the defendant possessed a firearm, and that a period of less than ten (10) years had elapsed since the defendant's completion of his sentence, probation, parole, or suspension of sentence for [his] conviction of distribution of cocaine on May 11th, 1998 in St. Mary Parish, Louisiana.

The trial court again mentioned intent when it charged the jury concerning attempted possession of a firearm:

> Attempt is any person, who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object, is guilty of an attempt to commit the offense intended, and it shall be immaterial whether under the circumstances he would have actually accomplished his purpose.

The trial court was correct that it defined general and specific intent in its jury charge. Though the district court did not specifically state that intent must be present in order for there to be a conviction, the jury instruction included the statement, "Intent is a question of fact which may be inferred from the circumstances. You may infer that the defendant intended the natural and probable consequences of his actions." This meant that the trial court instructed the jury that the defendant's intent was demonstrated by his actions. Where the defendant's actions proved possession of a firearm by a convicted felon, the required intent was

23

also present.[3] The defendant does not argue that this instruction was incorrect in the instant case. Because the information was contained in the general charge, the district court was not required to give the special jury instruction. "It need not be given if it is included in the general charge or in another special charge to be given." La.Code Crim.P. art. 807.

The defendant also complains that the trial court failed to reread the general instruction regarding intent when the jury requested an explanation of how possession was different than attempted possession. The record shows that, during deliberations, the jury sent a request to the district court: "Could you clarify the difference between guilty of possession and guilty of attempted possession." The trial court reread its instructions concerning what constituted possession of a firearm by a convicted felon and what constituted attempted possession of a firearm by a convicted felon.

The defense did not object to the district court's failure to reread the jury instructions concerning intent. Because the defendant failed to timely object to the district court's failure to additionally advise the jury concerning intent at this point in the deliberations, this court will not now consider the defendant's argument that the trial court erred in excluding the additional instruction. "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." La.Code Crim.P. art. 841.

Accordingly, this assignment of error is without merit.

---

[3]"The general intent to commit the offense may be proved through the actual or constructive possession of the firearm." *Drayton*, 63 So.3d at 324.

## **CONCLUSION**

The defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is not designated for publication.
See Uniform Rules—Courts of Appeal, Rule 2-16.3.