STATE OF LOUISIANA      *      NO. 2019-KA-0951

VERSUS      *

MATTHEW L. MAGRINI      *      COURT OF APPEAL

     FOURTH CIRCUIT

     * 

     STATE OF LOUISIANA

     * * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 533-877, SECTION "B"
Honorable Tracey Flemings-Davillier, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Chief Judge James F. McKay, III, Judge Terri F. Love, Judge Dale N. Atkins)


Arthur A. Lemann, III
ARTHUR A. LEMANN III & ASSOCIATES, INC.
1100 Poydras Street
Suite 3250
New Orleans, LA 70163

     COUNSEL FOR APPELLANT

Leon Cannizzaro
District Attorney
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

Kyle Daly
Donna Andrieu
DISTRICT ATTORNEY'S OFFICE
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119


     COUNSEL FOR APPELLEE

               **AFFIRMED AND REMANDED**
                   **MAY 27, 2020**

Matthew Magrini ("Defendant") appeals his conviction and sentence for vehicular homicide. For the reasons that follow, we affirm Defendant's conviction. However, we remand this matter to the district court with instructions to sentence Defendant pursuant to the conditions set forth in La. R.S. 14:32.1(B) and (C), and to impose the mandatory fine set forth in La. R.S. 14:32.1(B).

## PROCEDURAL HISTORY

On April 3, 2017, the State of Louisiana (the "State") filed a bill of information charging Defendant with vehicular homicide for a motorcycle accident that occurred on March 12, 2016, which resulted in the death of George Paitich, (the "victim"). The State alleged in the bill of information that Defendant's blood alcohol concentration ("BAC") was greater than .2 percent, a violation of La. R.S. 14:32.1(A)(2) and (A)(4).

Following a two-day jury trial, the jury found Defendant guilty of vehicular homicide, in violation of La. R.S. 14:32.1(A)(2) and (A)(4). On October 22, 2018, Defendant appeared for sentencing. After the State's witnesses testified and Defendant provided a statement to the district court, the district court sentenced Defendant to twenty-five years at hard labor. In accordance with La. R.S.

1

14.32:1(B), the district court ordered Defendant to serve the first five years of his sentence without the benefit of probation, parole, or suspension of sentence due to Defendant's BAC. Additionally, in accordance with La. R.S. 14:32.1(C), the district court declared the offense a crime of violence.

On February 5, 2019, after a multiple bill hearing, Defendant was adjudicated a third felony offender under the provisions of La. R.S. 15:529.1. Defendant waived all legal delays, the district court vacated the previously-imposed sentence, and sentenced Defendant to twenty-five years at hard labor without imposing the conditions set forth in La. R.S. 14:32.1(B) and (C).[1] Thereafter, on March 11, 2019, Defendant filed a Motion to Reconsider Sentence.

On April 12, 2019, Defendant filed a Notice of Appeal. Subsequently, Defendant filed a Motion to Stay Appeal pending the adjudication of his Motion to Reconsider Sentence. On May 17, 2019, the district court denied Defendant's Motion to Reconsider Sentence, and Defendant timely filed his second Notice of Appeal.

---

[1] La. R.S. 14:32.1(B) provides, in pertinent part, that:

> If the operator's blood alcohol concentration is 0.15 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence.

La. R.S. 14:32.1(C) provides, in pertinent part, that:

> Whoever commits the crime of vehicular homicide shall be sentenced as an offender convicted of a crime of violence if the offender's blood alcohol concentration, at the time of the offense, exceeds 0.20 percent by weight based on grams of alcohol per one hundred cubic centimeters of blood.

STATEMENT OF FACTS

On March 12, 2016, at approximately 9:08 p.m., 911 dispatch received a report of a motorcycle accident (the "accident") that occurred at the corner of Broadway Street and Washington Avenue in New Orleans. Testimonial and documentary evidence introduced at trial established that the accident involved one motorcycle, on which Defendant and the victim were riding, which crashed into a telephone phone, causing the victim's death. Upon arrival at the accident scene, Emergency Medical Services ("EMS") observed one man—Defendant—on the embankment of a canal near in the intersection of Broadway Street and Washington Avenue, and the victim face down in the drainage of the canal. Defendant and the victim were transported to University Medical Center ("UMC") for treatment. At UMC, the victim expired. The following evidence was adduced at trial:

**TRIAL TESTIMONY**

*Bridget Paitich's Testimony*

The State called Bridget Paitich ("Mrs. Paitich"), the victim's mother, to testify. Mrs. Paitich testified that her son was from St. Paul, Minnesota, and moved to New Orleans to be an elementary school teacher after accepting an assignment through the Teach for America Program.[2] Mrs. Paitich testified that she talked to her son almost every other day on the telephone and that she had no knowledge of her son ever riding a motorcycle or knowing how to drive one. Mrs. Paitich explained the victim could not drive a "shift car," so he would not know how to drive a motorcycle.

---

[2] As part of the Teacher for America program, the victim accepted an assignment to teach in New Orleans for one year at Arthur Ashe Charter School, where he taught children with special education and behavioral needs.

On cross-examination, Mrs. Paitich stated she did not think her son's death was intentional. She firmly stated that she knew he was not the driver of the motorcycle because the victim could not drive a motorcycle. Thus, when the local newspaper listed the victim as the driver of the motorcycle, she testified that she and her family knew that information was incorrect.

### Dr. Erin O'Sullivan's Testimony

Dr. Erin O'Sullivan ("Dr. O'Sullivan"), a forensic pathologist, also testified. Dr. O'Sullivan reviewed the findings of Dr. Richard Tracey ("Dr. Tracey"), the pathologist that performed the victim's autopsy.[3] She testified the victim was 5'9" and weighed 186 pounds. She explained the victim suffered contusions to his face, neck, left shoulder, wrist, and ankles as a result of the accident. Dr. O'Sullivan also explained the victim sustained multiple skull fractures and a subdural hemorrhage, which caused his death. She classified the victim's death as an accident.

On cross-examination, Dr. O'Sullivan testified the victim's BAC was .253 at the time of the autopsy. She further testified the hospital staff informed her office that the victim was the driver, but they did not provide information as to how they arrived at that conclusion. Thus, Dr. O'Sullivan explained she had no evidence to confirm that the victim was the driver of the motorcycle. On redirect examination, Dr. O'Sullivan testified the victim's BAC did not contribute to his death.

### David Zibro's Testimony

David Zibro ("Mr. Zibro"), a tour bus driver, who witnessed the accident on the night of March 12, 2016, also testified. Mr. Zibro testified that he was from Missouri, but had contracted to drive his tour bus for a high school music tour in

---

[3] At trial, the State stipulated that Dr. O'Sullivan did not perform the victim's autopsy. However, Dr. Tracey, the pathologist that did perform the autopsy, was not available to testify, as he was on permanent sick leave at the New Orleans Coroner's Office.

New Orleans. Mr. Zibro testified that, around 9:00 p.m., he drove the high school group as they left a concert venue that was in the area where the accident occurred, driving straight on Washington Avenue while traveling about twenty-five miles per hour in the right lane. There was no other traffic on the street that night.

Mr. Zibro testified that, while he was driving on Washington Avenue, he heard the sound of a motorcycle and saw it approaching at a high speed in his left rearview mirror. He explained that he could hear the motorcycle shifting gears as it increased in speed. As the motorcycle passed Mr. Zibro's bus, he noticed two people seated on it—a "heavyset" man who was the driver and a "very thin man" who was the passenger. He testified that he recalled that both men were wearing helmets. Mr. Zibro testified that the motorcycle passed him on the left side of his bus and was traveling "approximately, fifty-five, sixty miles per hour." He further explained that the passenger on the motorcycle was holding on to the driver "for dear life," and thought the man was "scared to death."

After the motorcycle passed his bus, Mr. Zibro observed the motorcycle veer into the right lane while shifting gears. He explained he was an experienced motorcyclist, so he was knowledgeable about how gears shifted on a motorcycle. Shortly thereafter, Mr. Zibro observed taillights and saw sparks go up into the air. Once Mr. Zibro saw the taillights and sparks, he testified that he knew an accident had occurred, and asked one of the chaperones on the bus to call 911. Mr. Zibro then drove to the area of the crash, parked the bus, and got out to render aid to the men. One of the chaperones followed Mr. Zibro off the bus to help.

Upon exiting the bus, Mr. Zibro observed the motorcycle at the telephone pole and immediately starting searching for the two men he had seen riding it. Mr. Zibro found Defendant on the embankment of the canal at the intersection and he

5

found the victim lying face down in the water in the canal. He then stepped into the canal, which was almost knee-high, and turned the victim over so that his face was no longer in the water. With the help of a chaperone from the music tour and a stranger, Mr. Zibro was able to get the victim out of the water and onto the concrete ground. Mr. Zibro checked the victim's neck for a pulse, but felt nothing. He then tried checking the victim's wrist and felt a slight pulse. The victim was bleeding heavily from his left side and did not appear to be breathing. Mr. Zibro then instructed the other two men to stay with the victim while he checked on Defendant. He testified Defendant was "pretty twisted up," and was lying on his back on the embankment of the canal. In open court, Mr. Zibro identified Defendant as the driver of the motorcycle.

When EMS arrived, Mr. Zibro spoke with an "older paramedic" and told him to tend to the victim first because he had been face down in the water for about "two minutes," and that he believed Defendant had a "few broken bones." The New Orleans Police Department ("NOPD") also responded to the scene, and Mr. Zibro testified that he dictated a statement to a chaperone, which he signed and gave to the responding NOPD officer. Mr. Zibro identified that statement in open court.

On cross-examination, Mr. Zibro testified he was sure the victim was wearing a helmet at the time of the accident, and that he believed Defendant was wearing a helmet as well. He also testified that he was unsure if he identified the driver and passenger of the motorcycle when he spoke to the paramedics. Mr. Zibro testified that he spoke with the responding NOPD officer prior to providing his written statement, and acknowledged his written statement was not as detailed as the oral statements he made to the chaperones on the bus because he was

6

"rattled and shaken" by what he had just witnessed, so he did not provide many details in his written statement. On redirect examination, Mr. Zibro testified that he never lost sight of the motorcycle after it passed him. Based on his observations, he testified it would have been impossible for the driver and passenger to change positions between the time when the motorcycle passed him and when the accident occurred.

### Richard Steesma's Testimony

The State then called Richard Steesma ("Pastor Steesma") to testify. Pastor Steesma testified he was one of the chaperones on the high school music tour, and that he was driving a rental van with the window down behind the tour bus on the night of the accident when he heard the motorcycle approaching. Shortly thereafter, Pastor Steesma saw the bus stop with its "flashers" on. He testified that he did not see the accident, but helped to direct the flow of traffic in the area of the accident. He described the passenger of the motorcycle as being taller and "skinnier" than the driver, and that the passenger was wearing a helmet and a backpack.

### Officer Laron Stewart's Testimony

Officer Laron Stewart ("Officer Stewart") testified he was the responding NOPD officer on the night of the accident. When he arrived at the scene, Officer Stewart observed EMS and "several rescue units," and described the scene as being "pretty chaotic." He further explained that one man had been placed in the ambulance when he arrived at the accident scene. The other man had already been transported to UMC prior to his arrival, so he did not speak with either men at the accident scene.

Officer Stewart testified that he spoke to the various rescue units and a witness, Mr. Zibro. After speaking with Mr. Zibro, Officer Stewart instructed Mr. Zibro to fill out a written statement, which Officer Stewart identified in open court. He testified that he did not ask Mr. Zibro who was the driver or passenger of the motorcycle at the accident scene. Officer Stewart testified that he cleared the accident scene and waited for a tow truck company to remove the motorcycle from the scene before going to UMC to check on the two men involved in the accident.

Once Officer Stewart arrived at the hospital, he learned that one of the men died from the injuries he sustained in the accident. He asked the hospital staff who they believed to be the driver of the motorcycle based on the injuries of the men. Officer Stewart testified the hospital staff "guesstimated" that the deceased man was the driver, and the passenger was the other injured man, Defendant. Based on this information, Officer Stewart listed the victim as the driver of the motorcycle in his Vehicle Traffic Crash Report (the "crash report"). After going to UMC, Officer Stewart testified he went back to the accident scene to canvass the area and look for surveillance footage of the accident. He explained, however, that the businesses in the area were closed and he was not able to view any cameras or obtain any video footage of the accident.

On cross-examination, Officer Stewart explained that he is a patrol officer and does not conduct the type of detailed investigations a detective conducts. He explained that Mr. Zibro was the only witness he spoke to at the accident scene. Upon his arrival, Officer Stewart explained that he was aware the accident may be fatal. However, as a patrol officer, he was not required to conduct an in-depth investigation other than speaking to witnesses and securing the scene. Officer Stewart explained he was aware the accident would be investigated further by a

detective, and the investigating detective would make the final determination regarding the fatality and identification of the driver. Further, Officer Stewart explained that he "relied" on the information of the medical personnel in listing the victim as the driver in his crash report and did not gather any more information to obtain the identification of the driver of the motorcycle.

### *Tom Paitich's Testimony*

Tom Paitich ("Mr. Paitich"), the victim's cousin, testified that, on the night of the accident, he received a still photograph of the victim and a video from the victim on "Snapchat." Mr. Paitich testified that the "Snapchat" video was timestamped at 9:07 p.m. Mr. Paitich identified the victim in the video and explained that the video depicted the victim riding on the back of the motorcycle. Mr. Paitich stated that seeing his cousin riding a motorcycle was "news" to him. Mr. Paitich further testified he could hear his cousin cursing in the video, and assumed that his cursing indicated he was scared. The victim's "Snapchat" video was played for the jury. On cross-examination, Mr. Paitich testified the video depicted another man on the motorcycle. He described this man as bald with a red beard, and that the man was not wearing a helmet in the video.

In Defendant's case-in-chief, Mr. Paitich was again called to testify as a witness. Mr. Paitich testified that he did not speak with the victim the night of the accident, but gathered information regarding the events of the accident from the victim's "Snapchat" posts, including the video. He also testified regarding his knowledge of how "Snapchat" operates, explaining that, when a person uploads a video to the "Snapchat" application, there is a lapse of time before another user receives it. Mr. Paitich explained that when a sequence of videos are posted on "Snapchat," only the last posted video is timestamped, so he could not establish the

lapse of time between each posted video. He admitted that he could not precisely say when or where the victim's "Snapchat" video was taken, only when he received it.

### *Detective Michael Baldassaro's Testimony*

Detective Michael Baldassaro ("Detective Baldassaro") testified that he is a detective in NOPD's Traffic Fatality Investigations Unit, and was assigned to investigate the accident. Once he was assigned, Detective Baldassaro reviewed Officer Stewart's crash report and spoke with the victim's mother, Mrs. Paitich. Detective Baldassaro asked Mrs. Paitich to send him the "Snapchat" video of the victim riding the motorcycle on the night of the accident. Detective Baldassaro took photographs of the damaged motorcycle as part of his investigation of the accident, which were published to the jury. Detective Baldassaro also interviewed Defendant at UMC, where Defendant stated that he could not recall what happened during the accident and that he did not know the victim.

After speaking with Defendant, Detective Baldassaro called Mr. Zibro to get his account of the accident. Detective Baldassaro testified that Mr. Zibro identified the larger man—Defendant—as the operator of the motorcycle and the smaller man—the victim—as the passenger. Mr. Zibro also described where and how he found the men at the accident scene after the crash. After his conversation with Mr. Zibro, Detective Baldassaro reviewed the "Snapchat" video, which depicted a larger man with a "reddish" beard as the operator of the motorcycle. Detective Baldassaro identified the larger man with the "reddish" beard in the video as Defendant, whom Detective Baldassaro interviewed at the hospital. Detective Baldassaro then sent the video over to the Digital Forensic Unit, where he learned the video was sent at 9:07 p.m. on the night of the accident. Detective Baldassaro

testified he also obtained a search warrant for Defendant's hospital records as part of his investigation and, after reviewing them, Detective Baldassaro learned that Defendant's blood tests revealed Defendant's BAC was .232—almost three times the legal driving limit of .08—when he was admitted into the hospital.

### Dr. Randall Cornateanu's Testimony

The State also called Dr. Randall Cornateanu ("Dr. Cornateanu"), a surgical resident at UMC who treated Defendant on the night of the accident and who ordered blood tests upon Defendant's arrival at the hospital. He explained that such an order was a "standard methodology for all traumas that come in." Dr. Cornateanu testified Defendant's blood tests results revealed that Defendant's "[e]thanol [was] .232 milligrams per deciliter…which [was] a high number." He explained, in "layman's terms," that "by .2 to .25…you have complete loss of motor function." He further testified Defendant's BAC was flagged in the medical records as "H" for "high."

### Chief Bouvier's Testimony

During his case-in-chief, Defendant called Chief Kenneth Bouvier ("Chief Bouvier"), who testified he worked for New Orleans EMS and was one of the EMS responders at the accident scene. He testified he did not personally render any aid at the scene, but stated both Defendant and the victim had to be retrieved from the canal. Chief Bouvier testified that the "person in the bus led him to believe that the man face down in the water was the passenger of the motorcycle, and that the man laying on the concrete was the driver of the motorcycle." Chief Bouvier further testified that he spoke to the "DA" about the case, at which time he could not recall what he placed in his report from the night of the accident. Thus, Chief Bouvier asked his secretary to pull the report and realized his report was inconsistent with

what he recalled the witness telling him the night of the accident because his report reflects that the passenger of the motorcycle was the man on the embankment of the canal (Defendant), and the driver was the man lying face down in the canal (the victim).

On cross-examination, Chief Bouvier testified that he spoke to prosecutors two days before his testimony at trial. He recalled informing the prosecutors that Defendant was the driver, and that his report indicating otherwise was inaccurate. Chief Bouvier explained that he did not author the report. He further explained that "someone on that bus" informed him that Defendant was the driver and the man lying face down in the canal—the victim—was the passenger. Thus, he relayed the information provided by the witness to his colleague, who authored the report. Chief Bouvier testified that he did not know why his report was inconsistent with the statement he provided to his colleague.[4]

### EMS William Niemeck's Testimony

Defendant then called William Niemeck ("Mr. Niemeck") to testify. Mr. Niemeck testified he worked for New Orleans EMS and was one of the EMS responders at the accident scene. Mr. Niemeck testified the report indicated a witness on the scene identified Defendant as the passenger.

### Documentary Evidence

In addition to the live trial testimony, documentary evidence was introduced, as well, including: (1) Officer Stewart's dash camera footage showing the accident scene; (2) photographs of Defendant's damaged motorcycle; (3) Mr. Zibro's written witness statement; (4) an audio of the recorded 911 call on the night of the

---

[4] Notably, Chief Bouvier's testimony was inconsistent regarding what information he was told by the "person on the bus," whom he never identified, and what his report reflects.

accident; (5) the victim's "Snapchat" video posted the night of the accident; and (6) Defendant's State Farm insurance records. The State also offered a stipulation of the following testimony, by Assistant District Attorney, Naomi Jones, into evidence at trial:

> Now into court comes the State of Louisiana through the undersigned Assistant District Attorney for the Parish of Orleans who furnishes the Defense with the following exculpatory information to wit: "On March 30, 2017 Officer Leron Stewart told Assistant District Attorney Naomi Jones that the witness pointed to the defendant and victim and identified them as the passenger and driver as they are identified in Officer Stewart's report, signed by Assistant District Attorney Bonycle Thornton dated July 14, 2017."

## ERRORS PATENT

Pursuant to La. C.Cr.P. art. 920,[5] "all appeals are routinely reviewed for errors patent on the face of the record." *State v. Ladmirault*, 2019-0512, p. 3 (La. App. 4 Cir. 12/18/19), 286 So.3d 1206, 1210. A review of the record reveals two errors patent in Defendant's sentence.

The district court sentenced Defendant to twenty-five years at hard labor. This sentence is illegally lenient in two respects. First, the district court failed to impose the mandatory fine set forth in La. R.S. 14:32.1(B), which provides, in pertinent part, that "[w]hoever commits the crime of vehicular homicide **shall be fined not less than two thousand dollars nor more than fifteen thousand dollars** and shall be imprisoned with or without hard labor for not less than five years nor more than thirty years." (Emphasis added). Therefore, we must remand this case to the district court to rectify the omission and impose the mandatory fine under La. R.S. 14:32.1(B). *See State v. Stephens*, 2009-0631, p. 10 (La. App. 4 Cir. 11/24/09), 27 So.3d 987, 993.

---

[5] La. C.Cr.P. art. 920 provides, in pertinent part, "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

Second, the district court failed to impose the conditions set forth in La. R.S. 14:32.1(B) and (C). The district court initially sentenced Defendant in accordance with La. R.S. 14.32.1 (B) and (C), ordering Defendant serve the first five years of his sentence without the benefit of probation, parole, or suspension of sentence, and declaring the offense a crime of violence. After the multiple bill hearing, the district court vacated the sentence it previously imposed, and adjudicated Defendant a habitual offender pursuant to La. R.S. 15:529.1. The district court then sentenced Defendant to twenty-five years at hard labor, but failed to impose the sentence without the benefit of probation, parole, or suspension of sentence as required by La. R.S. 14:32.1 (B) and (C). In Louisiana, a habitual offender's "penalty increase is computed by reference to the sentencing provisions of the underlying offense." *State v. Bruins*, 407 So.2d 685, 687 (La. 1981). "Similarly, the conditions imposed on the sentence are those called for in the reference statute." *Id.* Thus, we remand to the district court with instructions to sentence Defendant pursuant to the conditions set forth in La. R.S. 14:32.1(B) and (C).

## DISCUSSION

**Motion to Vacate**

Before we address the assignments of error raised by Defendant, we must address Defendant's Motion to Vacate. In his motion, Defendant argues that, because the State lost all of the original trial exhibits in this matter, his appellate counsel cannot adequately perform his duties on appeal. Additionally, Defendant argues that La. Const. Art. I § 19 guarantees the "right to judicial review based upon a complete record of all evidence upon which the judgment is based." Thus, he contends his conviction and sentence should be vacated and a new trial should be ordered.

14

A review of the record reveals that, after this matter was lodged, this Court ordered the Clerk of Orleans Parish Criminal District Court to supplement the record with all documentary, audio, video, and photographic exhibits introduced at trial. In response to this Order, the Clerk of Orleans Parish Criminal District Court notified this Court that the Property and Evidence Office did not receive the evidence introduced at trial in this matter. This Court then ordered the State to locate and cause to be filed the State's exhibits "S-1" through "S-10" introduced at trial.[6] Thereafter, the State filed its initial Notice of Compliance indicating that "S-1 (family poster)" and "S-2 (victim poster)" had been located, but that the State was unable to locate the remaining exhibits. However, the State informed this Court that it could compile copies of the remaining exhibits, which were submitted on a compact disc. The State also filed a third poster board marked as "Exhibit 12," which was a screenshot of the victim's "Snapchat" video from Mr. Paitich's phone.

After Defendant and the State filed briefs in this matter, Defendant renewed his objections. Specifically, he argued that the copy of "S-6 (Zibro statement)" filed by the State was not the statement of Mr. Zibro that was introduced at trial. Consequently, the State filed a Second Notice of Compliance wherein it submitted Mr. Zibro's written statement introduced at trial. The State also corrected its earlier filing by providing copies of the photographs of the damaged motorcycle introduced at trial, a copy of the certification of Defendant's State Farm insurance records, and a copy of Officer Stewart's dash camera footage.

---

[6] This Court's order listed the State's exhibits S-1 through S-10 as follows: "S-1 (family poster);" "S-2 (victim poster);" "S-3 (autopsy report);" "S-4 (incident recall);" "S-5 (911 call);" "S-6 (Zibro statement);" "S-7 (Snapchat video);" "S-8 (englobo photos);" "S-9 (medical records);" and "S-10 (State Farm insurance records)."

In Louisiana, it is well-settled that a criminal defendant "has a right to a complete transcript of the trial proceedings, particularly, where as here, appellate counsel was not counsel at trial," and is "constitutionally guaranteed the right of appeal 'based upon a complete record of all the evidence upon which the judgment is based.'" *State v. Deruise*, 1998-0541, p. 10 (La. 4/3/01), 802 So.2d 1224, 1234 (citing *Hardy v. United States*, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964); *State v. Robinson*, 387 So.2d 1143 (La. 1980); La. Const. Art. I § 19). "Thus, material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal." *Id.* (citing *State v. Landry*, 1997-0499, p. 2 (La. 6/29/99), 751 So.2d 214, 215). However, "inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may nonetheless be adequate for appellate review." *Id.*, 1998-0541, p. 11, 802 So.2d at 1234 (citing *State v. Castleberry*, 1998-1388, p. 29 (La. 4/13/99), 758 So.2d 749, 773). Moreover, "a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts." *Id.* (citing *Castleberry*, 1998-1388, p. 29, 758 So.2d at 773).

In this matter, the State has supplemented the record with all copies of the original trial exhibits. The record reflects that the copies submitted by the State are authentic. The record is complete, and this Court is able to conduct an adequate appellate review. As such, we find that Defendant has not been prejudiced by the loss of the original trial exhibits. Defendant's Motion to Vacate is denied.

**Assignments of Error**

Now, we will address Defendant's two assignments of error. First, Defendant contends the evidence presented at trial was insufficient to support his conviction for vehicular homicide, contending that the State failed to meet its

burden of showing that he was the driver of the motorcycle and that his BAC contributed to the victim's death. Second, Defendant argues the district court abused its discretion in admitting his State Farm insurance records into evidence at trial. We address each assignment of error in turn.

**Assignment of Error Number One – Insufficient Evidence**

In Defendant's first assignment of error, he argues the evidence presented at trial was not sufficient to support his conviction. "The standard for reviewing a claim of sufficiency of the evidence is well settled." *State v. Pierre*, 2004-0010, p. 2 (La. App. 4 Cir. 2/25/04), 869 So.2d 246, 248. "Simply stated, all evidence, direct and circumstantial, must meet the reasonable doubt standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979)." *Id.*, 2004-0010, pp. 2-3, 869 So.2d at 248. In *State v. Miner*, this Court provided that:

> [T]he applicable standard of review for sufficiency of the evidence claims is as follows: In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Defendant guilty beyond a reasonable doubt.

2014-0939, p. 5 (La. App. 4 Cir. 3/11/15), 163 So.3d 132, 135-36 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781).

Additionally, "as a reviewing court, we are highly deferential to the findings of the trier of fact." *State v. Jones*, 2015-0956, p. 5 (La. App. 4 Cir. 3/22/17), 214 So.3d 124, 133 (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *State v. Armstead*, 2014-0036, p. 11 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 512). "A jury may accept as true the testimony of any witness, even a single witness, and find such testimony sufficient to establish each essential element beyond a reasonable

17

doubt." *Id.* (citing *State v. Clements*, 2015-0630, p. 7 (La. App. 4 Cir. 5/4/16), 194 So.3d 712, 717).

In regards to a conviction based on circumstantial evidence, "[La.] R.S. 15:438 sets forth the rule that, in order to convict, the evidence must exclude every reasonable hypothesis of innocence." *State v. Morris*, 414 So.2d 320, 321 (La. 1982). *See also* La. R.S. 15:438. "[W]hen we review a conviction based upon circumstantial evidence we must determine that, viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded." *Id.*, 414 So.2d at 321-22 (citing *State v. Austin*, 399 So.2d 158, 160 (La. 1981)).

In this matter, Defendant was convicted of vehicular homicide, in violation of La. R.S. 14:32.1(A)(2) and (A)(4). La. R.S. 14:32.1(A)(2) and (A)(4) provide:

> A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exist and such condition was a contributing factor to the killing:
>
> (1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
>
> (2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.
>
> ****
>
> (4) The operator is under the influence of alcoholic beverages.

"In order to convict a defendant under the vehicular homicide statute, the State must prove that an offender's unlawful blood alcohol concentration,

18

combined with his operation of a vehicle, caused the death of a human being." *State v. Kenny*, 2011-1819, p. 8 (La. App. 4 Cir. 5/29/13), 116 So.3d 992, 997 (citing *State v. Taylor*, 463 So.2d 1274, 1274-1275 (La. 1985)). Defendant argues the State failed to prove beyond a reasonable doubt that: (1) Defendant was the driver of the motorcycle and (2) that there was a causal connection between his BAC and the victim's death. We disagree.

## I.    Defendant as the Driver of the Motorcycle

First, Defendant argues his conviction is based solely on circumstantial evidence, and the State did not present sufficient evidence to exclude every reasonable hypothesis of innocence. To support this argument, Defendant asserts the following trial evidence failed to exclude every reasonable hypothesis of innocence that Defendant was not the driver of the motorcycle: (1) Officer Stewart, the responding officer, listed the victim as the driver of the motorcycle in his crash report; (2) Mr. Niemeck, the EMS responder, testified someone at the accident scene identified the man lying face down in the canal (the victim) as the driver of the motorcycle at the accident scene; and (3) the hospital staff acknowledged the victim as the driver of the motorcycle. Defendant also asserts that the eyewitnesses, Mr. Zibro and Pastor Steesma, gave conflicting accounts on the night of the accident regarding the identification of the driver of the motorcycle. Defendant submits that it was not until the discovery of the "Snapchat" video that the focus of the investigation turned to him.

Contrary to Defendant's assertions, the State's case was not based solely on circumstantial evidence, but on direct evidence as well. The direct and testimonial evidence explicitly reveal Defendant was the driver of the motorcycle. Mr. Zibro, who witnessed the accident, saw the victim and Defendant riding on the

motorcycle immediately before the accident, and unequivocally identified Defendant as the driver of the motorcycle. Specifically, Mr. Zibro testified the driver of the motorcycle was a "heavier man, wearing a white shirt." In open court, Mr. Zibro identified Defendant as the man he witnessed driving the motorcycle on the night of the accident. Pastor Steesma testified the passenger of the motorcycle was "taller and skinnier" than the driver. Testimony and medical records offered as evidence at trial revealed that Defendant weighed about 252 to 272 pounds, while the victim weighed 186 pounds. This evidence corroborates Mr. Zibro's and Pastor Steesma's testimony that Defendant was the "heavier man," and the victim was "skinnier." Photographs introduced into evidence at trial also depicted the victim as a tall and slender man. There was no other evidence presented at trial to dispute that Defendant was not "heavier" than the victim.

Defendant also argues Mr. Zibro's testimony at trial directly conflicted with his written statement. Mr. Zibro provided the following written statement to Officer Stewart:

> While heading South on Washington in the right lane a bike in left lane went by me very fast. I noticed up a head sparks from motorcycle and red tail light in air which indicates crash of bike. We stopped bus at crash site. Dan and I exited bus, found 1 man in canal on concrete and saw 2nd man in canal in water face down. I jumped over wall went to the person in water and pulled him out of water and put him on his back with Dan's help. 911 arrived 5 minutes later.

Contrary to Defendant's assertion that Mr. Zibro's written statement conflicted with his testimony, this statement does not identify any person as the passenger or driver. At trial, Mr. Zibro explained he did not provide a more descriptive statement to Officer Stewart because he was "rattled and shaken" about the accident he had just witnessed. Mr. Zibro's testimony that he was rattled was corroborated by Officer Stewart's dash camera footage where Mr. Zibro's voice

20

appeared to be unsteady while describing what he witnessed as he spoke to Officer Stewart. Even though Mr. Zibro did not identify the driver and passenger of the motorcycle in his written statement, the record reflects that Mr. Zibro did provide a description of the driver and passenger of the motorcycle when he spoke with Detective Baldassaro. Detective Baldassaro testified Mr. Zibro identified the larger man as the operator of the motorcycle and the smaller man as the passenger. Mr. Zibro's statement to Detective Baldassaro was consistent with Mr. Zibro's trial testimony identifying Defendant as the driver of the motorcycle.

Additionally, the record reflects that Officer Stewart did not definitively conclude the victim was the driver of the motorcycle. Officer Stewart testified the hospital staff "guesstimated" the deceased man was the driver, and the passenger was the other injured man. Officer Stewart admitted he listed the victim as the driver of the motorcycle in his crash report strictly based on the information provided by the hospital personnel. Officer Stewart also testified that, as a patrol officer, he did not make the final determination regarding the identification of the driver of the motorcycle. He testified that he knew the investigating detective would make the final determination regarding identification of the driver, and the investigating detective, Detective Baldassaro, ultimately determined the driver to be Defendant. Additionally, Chief Bouvier's testimony directly contradicted Mr. Niemeck's testimony. Mr. Niemeck testified a witness stated the man lying face down in the canal was the driver. However, Chief Bouvier testified he was "led to believe" that Defendant, who was not located lying face down in the canal, was the driver after speaking with "someone from that bus" at the accident scene. This information was relayed to another paramedic on the scene to place in his report, but the paramedic incorrectly drafted the report.

21

Further, Defendant argues the circumstantial evidence—the "Snapchat" video—does not exclude every reasonable hypothesis of innocence. This argument fails. The "Snapchat" video unmistakably shows Defendant as driver of the motorcycle. The "Snapchat" video, which is timestamped 9:07 p.m., was sent only a minute before the 911 call that reported the accident was made at 9:08 p.m.

Defendant argues that, within the sixty second lapse in time between the posting of the "Snapchat" video and the 911 call, the men could have "switched positions" on the motorcycle. However, Mr. Zibro's testimony directly contradicts this argument, as well. Mr. Zibro testified he observed the motorcycle from the time it passed his bus until it crashed. He testified that it would have been impossible for the men to have "switched positions" on the motorcycle prior to the accident. Moreover, there was no evidence presented to suggest the victim was ever the driver of the motorcycle or knew how to drive a motorcycle. Mrs. Paitich, the victim's mother, testified that she never knew her son to ride a motorcycle and that he did not know how to drive a motorcycle. Similarly, Mr. Paitich, the victim's cousin, testified that it was "news" to him to see the victim on the back of the motorcycle in the "Snapchat" video, and that the victim appeared scared in the video. Mr. Zibro, an experienced motorcyclist, also testified he could hear the motorcycle shift gears as it increased in speed, explaining that only an experienced driver would know how to drive a motorcycle in that manner. Mr. Zibro further testified that the passenger of the motorcycle was "hanging on for dear life." In light of the testimony from Mrs. Paitich, Mr. Paitich, and Mr. Zibro, it is reasonable to conclude that the passenger of the motorcycle was the victim, while Defendant was the driver.

Given the totality of the evidence presented at trial viewed in the light most favorable to the prosecution, we find that a reasonable jury could have found beyond a reasonable doubt that Defendant was the driver of the motorcycle.

## II. Causation

Next, Defendant argues the State failed to prove Defendant's BAC was a contributing factor to the victim's death, and not that other factors—such as a bump in the road, a pothole in the street, an action by the victim, or a "darting" cat or barking dog—caused the accident.

"The Louisiana Supreme Court has determined that a causal relation between the defendant's conduct and the harm for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime." *Kenny*, 2011-1819, p. 8, 116 So.3d at 997. "Causation is a question of fact which has to be considered in the light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct." *Id*. (citing *State v. Kalathakis*, 563 So.2d 228, 231 (La. 1990)). "A defendant should not be held responsible for remote and indirect consequences which a reasonable person could not have foreseen as likely to have flowed from his conduct or from those consequences which would have occurred regardless of his conduct." *Id*., 2011-1819, pp. 8-9, 116 So.3d at 997.

A review of the record shows the State established causation. The State established Defendant's BAC was .232, three times the legal limit. Dr. Cornateanu, Defendant's treating physician, testified Defendant's BAC was flagged in the medical records as "H" for "high." Dr. Cornateanu also testified that a person with a BAC as high Defendant's would experience "complete loss of motor function." Further, Mr. Zibro's account of the accident shows Defendant failed to control the

motorcycle properly and that there was no other traffic on the street prior to the accident. There is nothing in the record to show that there was a pothole, or any other obstruction on the street, that would have caused the motorcycle to hit the telephone pole, or that Defendant could not have avoided the accident had his BAC not been so high.

Accordingly, we find the evidence presented at trial was sufficient for a reasonable jury to find beyond a reasonable doubt that Defendant's impairment due to an extremely high BAC dulled his thought processes, his reflexes, and motor functioning, and affected his decision-making to a degree sufficient to be a contributing factor of the victim's death.

**Assignment of Error Number Two – Admission of State Farm's Business Records**

In Defendant's second assignment of error, he argues the district court abused its discretion in admitting his State Farm insurance records into evidence at trial and that allowing the State to reference State Farm's acceptance of liability and payment of the claim in its closing argument at trial compounded the error. As a result, Defendant argues he is entitled to a new trial. The record reflects that, when the State moved to introduce these records into evidence at trial, Defendant objected to the introduction of the records on the grounds the records were not self-authenticating. The State then tendered a certification affidavit from State Farm's custodian of records, arguing that the records were self-authenticating. However, Defendant maintained his objection that the records were not self-authenticating and could not be introduced without a custodian present to authenticate them. The district court considered Defendant's objection in chambers, but ultimately

overruled the objection, and the records were admitted into evidence at trial pursuant to La. C.E. art. 803.1.[7]

"It is well-settled that an irregularity or error, relating to 'the ruling or order of the court,' cannot be availed of after verdict unless it was objected to at the time of occurrence." *State v. Griffin*, 2015-0125, p. 23 (La. App. 4 Cir. 9/16/15), 176 So.3d 561, 574 (citing La. C.Cr.P. art. 841(A)). "Not only must a contemporaneous

---

[7] La. C.E. art. 803.1 provides:

> A. (1) Except as otherwise provided by this Code, in a criminal proceeding, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests to the following:
>
> (a) Such record was made, at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of those matters; and
>
> (b) Such record was kept in the course of a regularly conducted business activity; and
>
> (c) The business activity made such a record as a regular practice; and
>
> (d) If such record is not the original, such record is a duplicate of the original, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
>
> (2) A party intending to offer in evidence pursuant to this Article a foreign record of regularly conducted activity shall provide written notice of that intention to each other party not less than ten days prior to trial. A motion opposing admission in evidence of such record shall be made by the opposing party and determined by the court before trial. Failure by a party to file such motion before trial shall constitute a waiver of objection to such record or duplicate, but the court for cause shown may grant relief from the waiver.
>
> B. As used in this Article:
>
> (1) "Foreign record of regularly conducted activity" means a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, maintained by a business domiciled in a jurisdiction outside the territorial limits of the state of Louisiana.
>
> (2) "Foreign certification" means a written declaration made and signed in a jurisdiction outside the territorial limits of the state of Louisiana by the custodian of a business record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of the state of Louisiana.
>
> (3) "Business" includes a business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

objection be made, but also La. C.Cr.P. art. 841 A requires that a defendant make 'known to the court ... the grounds therefor,' i.e., the grounds for his objection, and he is limited on appeal to the grounds articulated at trial." *Id.*, 2015-0125, p. 23, 176 So.3d at 574-75 (citing *State v. Ott*, 2010-1307, p. 13 (La. App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287). "A new basis for objection cannot be raised for the first time on appeal." *Id.* (citing *State v. Carter*, 2010-0614, pp. 27-28 (La. 1/24/12), 84 So.3d 499, 521).

On appeal, Defendant argues he did not have an opportunity to exercise his constitutional right to confront and cross-examine a witness—specifically, the insurance adjuster who handled the claim for State Farm—against him, and that State Farm's business records are hearsay. As such, he argues a new trial is warranted. However, the record reflects Defendant objected at trial on the grounds that the records were not self-authenticating and not on the basis of hearsay. Given that the record reflects the district court did not rule on the issues raised by this assignment of error, we find these issues are not properly before us. Thus, we decline to consider them.

## DECREE

For the aforementioned reasons, we affirm Defendant's conviction. However, we remand this matter to the district court with instructions to sentence Defendant pursuant to the conditions set forth in La. R.S. 14:32.1(B) and (C), and specifically to impose the mandatory fine set forth in La. R.S. 14:32.1(B).

**AFFIRMED AND REMANDED**

26